METROPOLITAN STEVEDORE CO. *v.* RAMBO ET AL.

No. 96–272.   Argued March 17, 1997—Decided June 19, 1997

122

SOUTER, J., delivered the opinion of the Court, in which REHNQUIST, C. J., and STEVENS, KENNEDY, GINSBURG, and BREYER, JJ., joined. O'CONNOR, J., filed a dissenting opinion, in which SCALIA and THOMAS, JJ., joined, *post*, p. 141.

*Robert E. Babcock* argued the cause and filed a brief for petitioner.

*Malcolm L. Stewart* argued the cause for the federal respondent. With him on the brief were *Acting Solicitor General Dellinger, Deputy Solicitor General Kneedler, J. Davitt McAteer, Allen H. Feldman, Nathaniel I. Spiller,* and *Scott Glabman. Thomas J. Pierry III* argued the cause for respondent Rambo. With him on the brief was *Thomas J. Pierry.** 

JUSTICE SOUTER delivered the opinion of the Court.

This case under the Longshore and Harbor Workers' Compensation Act is before us a second time, now raising the question whether the Act bars nominal compensation to a worker who is presently able to earn at least as much as before he was injured. We hold nominal compensation proper when there is a significant possibility that the worker's wage-earning capacity will fall below the level of his preinjury wages sometime in the future.

---

*Briefs of *amici curiae* urging reversal were filed for the National Association of Waterfront Employers et al. by *Charles T. Carroll, Jr., F. Edwin Froelich,* and *Franklin W. Losey;* and for the National Steel and Shipbuilding Co. by *Alvin G. Kalmanson* and *Roy D. Axelrod.*

## I

Respondent John Rambo injured his back and leg in 1980 while doing longshore work for petitioner Metropolitan Stevedore Company. Rambo claimed against Metropolitan for compensation under the Longshore and Harbor Workers' Compensation Act (LHWCA or Act), 44 Stat. 1424, as amended, 33 U. S. C. § 901 *et seq.*, and the parties stipulated that Rambo had sustained a 22½% permanent partial disability, which would normally reflect a $120.24 decline in his preinjury $534.38 weekly wage. This, in turn, was reduced to an award of $80.16 per week under § 8(c)(21) of the Act, 33 U. S. C. § 908(c)(21), providing for compensation at the rate of 66⅔% of the difference between an employee's preinjury wages and postinjury wage-earning capacity. An Administrative Law Judge (ALJ) entered an order incorporating this stipulated award. App. 51; *Metropolitan Stevedore Co.* v. *Rambo (Rambo I)*, 515 U. S. 291, 293 (1995).

Rambo was later trained as a longshore crane operator and got full-time work with his new skills, with occasional stints as a heavy-truck operator to earn extra pay. His resulting annual earnings between 1985 and 1990 were about three times what he had made before his injury. As a consequence, Metropolitan moved in 1989 to modify Rambo's earlier disability award, see § 22, 33 U. S. C. § 922, and a hearing was held before an ALJ. While there was no evidence that Rambo's physical condition had improved, the ALJ ordered the disability payments discontinued based on the tripling of Rambo's preinjury earnings:

> "After taking into consideration the increase in wages due to the rate of inflation and any increase in salary for the particular job, it is evident that [Rambo] no longer has a wage-earning capacity loss. Although [Rambo] testified that he might lose his job at some future time, the evidence shows that [Rambo] would not be at any

greater risk of losing his job than anyone else. Moreover, no evidence has been offered to show that [Rambo's] age, education, and vocational training are such that he would be at greater risk of losing his present job or in seeking new employment in the event that he should be required to do so. Likewise, the evidence does not show that [Rambo's] employer is a beneficent one. On the contrary, the evidence shows that [Rambo] is not only able to work full time as a crane operator, but that he is able to work as a heavy lift truck operator when the time is available within which to do so." App. 55.

See also *Rambo I*, *supra*, at 293–294.

The Benefits Review Board affirmed the modification order, App. 57, 61, but the Court of Appeals for the Ninth Circuit reversed on the ground that § 22 authorizes modification of an award only for changed physical conditions, *Rambo v. Director, OWCP*, 28 F. 3d 86 (1994). We in turn reversed in *Rambo I*, holding that "[t]he fundamental purpose of the Act is to compensate employees (or their beneficiaries) for wage-earning capacity lost because of injury; where that wage-earning capacity has been reduced, restored, or improved, the basis for compensation changes and the statutory scheme allows for modification." 515 U. S., at 298. Since the essence of wage-earning capacity is economic, not physical, *id.*, at 296–298, that capacity may be affected "even without any change in the employee's physical condition," *id.*, at 301.

On remand, the Court of Appeals again reversed the order discontinuing compensation payments. It recognized that when a worker suffers a significant physical impairment without experiencing a present loss of earnings, there may be serious tension between the statutory mandate to account for future effects of disability in determining a claimant's wage-earning capacity (and thus entitlement to compensa-

tion), see § 8(h), 33 U. S. C. § 908(h), and the statutory prohibition against issuing any new order to pay benefits more than one year after compensation ends or an order is entered denying an award, see § 22, 33 U. S. C. § 922. The Court of Appeals reconciled the two provisions by reading the statute to authorize a present nominal award subject to later modification if conditions should change. *Rambo* v. *Director, OWCP,* 81 F. 3d 840, 844 (1996). The court reversed the order ending Rambo's benefits as unsupported by substantial evidence, due to "overemphasi[s on] Rambo's current status and fail[ure] to consider the effect of Rambo's permanent partial disability on his future earnings," *ibid.,* and it remanded for entry of a nominal award reflecting Rambo's permanent partial disability, *id.,* at 845.[1] We granted certiorari. 519 U. S. 1002 (1996). While we agree that nominal compensation may be awarded under certain circumstances despite the worker's present ability to earn more than his preinjury wage, we vacate the judgment of the Court of Appeals directing entry of such an award and remand for factfinding by the ALJ.

## II

The LHWCA authorizes compensation not for physical injury as such, but for economic harm to the injured worker from decreased ability to earn wages. See *Rambo I, supra,* at 297–298. The Act speaks of this economic harm as "disability," defined as the "incapacity because of injury to earn the wages which the employee was receiving at the time of injury in the same or any other employment," § 2(10), 33 U. S. C. § 902(10). Such incapacity is conclusively presumed for certain enumerated or "scheduled" injuries, which are compensated at 66⅔% of the worker's preinjury wages over specified periods of time. See §§ 8(c)(1)–8(c)(20), 8(c)(22), 33 U. S. C. §§ 908(c)(1)–908(c)(20), 908(c)(22); *Potomac Elec. Power Co.* v. *Director, Office of Workers' Compensation Pro-*

---

[1] Judge Reinhardt dissented in part on other grounds. 81 F. 3d, at 845.

*grams,* 449 U. S. 268, 269 (1980). For other, so-called "un-scheduled" injuries resulting in less than total disability, the Act sets compensation at "66⅔ per centum of the difference between the average weekly [preinjury] wages of the employee and the employee's wage-earning capacity thereafter." § 8(c)(21), 33 U. S. C. § 908(c)(21) (permanent partial disability); see also § 8(e), 33 U. S. C. § 908(e) (temporary partial disability). For figuring this difference, § 8(h) explains that the claimant's postinjury "wage-earning capacity" is to be determined

> "by his actual earnings if such actual earnings fairly and reasonably represent his wage-earning capacity: *Provided, however,* That if the employee has no actual earnings or his actual earnings do not fairly and reasonably represent his wage-earning capacity, the deputy commissioner may, in the interest of justice, fix such wage-earning capacity as shall be reasonable, having due regard to the nature of his injury, the degree of physical impairment, his usual employment, and any other factors or circumstances in the case which may affect his capacity to earn wages in his disabled condition, including the effect of disability as it may naturally extend into the future." § 8(h), 33 U. S. C. § 908(h).

See also § 10, 33 U. S. C. § 910 (method for determining preinjury wages). See generally *Rambo I,* 515 U. S., at 297–298.

We may summarize these provisions and their implications this way. Disability is a measure of earning capacity lost as a result of work-related injury. By distinguishing between the diminished capacity and the injury itself, and by defining capacity in relation both to the injured worker's old job and to other employment, the statute makes it clear that disability is the product of injury and opportunities in the job market. Capacity, and thus disability, is not necessarily reflected in actual wages earned after injury, see *id.,* at 300–301; *Potomac Elec. Power, supra,* at 272, n. 5, and when

it is not, the factfinder under the Act must make a determination of disability that is "reasonable" and "in the interest of justice," and one that takes account of the disability's future effects, § 8(h).

In some cases a disparity between the worker's actual postinjury wages and his job-market capacity will be obvious, along with the reasons for it. If a disabled worker with some present capacity chooses not to work at all, or to work at less than his capacity, a windfall is avoided by determining present disability and awarding a benefit accordingly. See, e. g., Penrod Drilling Co. v. Johnson, 905 F. 2d 84, 87–88 (CA5 1990). At the other extreme, a worker with some present disability may nonetheless be fortunate enough to receive not merely the market wages appropriate for his diminished capacity, but full preinjury wages (say, because an employer is generous, for whatever reason). See, e. g., Travelers Ins. Co. v. McLellan, 288 F. 2d 250, 251 (CA2 1961); see also Edwards v. Director, OWCP, 999 F. 2d 1374, 1375–1376 (CA9 1993) (holding that wages from short-lived employment do not represent actual earning capacity on open market). Once again, the present disability may still be calculated and a corresponding award made.

A problem in applying the provisions applicable when there is a disparity between current wages and wage-earning capacity arises in a case like this one, however. The worker now receives appropriate market wages as high or higher than those before his injury, thus experiencing no decline in present capacity. And yet (we assume for now) there is some particular likelihood that in the future the combination of injury and market conditions may leave him with a lower capacity. The question is whether such a person is presently disabled within the meaning of the statute, and if so, what provision should be made for the potential effects of disability in the future.

There are two reasons to treat such a person as presently disabled under the statute. The first follows from the provi-

sion of law that on its face bars an injured worker from waiting for adverse economic effects to occur in the future before bringing his disability claim, which generally must be filed within a year of injury. § 13(a), 33 U. S. C. § 913(a); *Pillsbury* v. *United Engineering Co.*, 342 U. S. 197 (1952). He is also barred from seeking a new, modified award after one year from the date of any denial or termination of benefits. § 22, 33 U. S. C. § 922. Because an injured worker who has a basis to anticipate wage loss in the future resulting from a combination of his injury and job-market opportunities must nonetheless claim promptly, it is likely that Congress intended "disability" to include the injury-related potential for future wage loss.[2] And because a losing claimant loses for all time after one year from the denial or termination of benefits, it is equally likely that Congress intended such a claimant to obtain some award of benefits in anticipation of the future potential loss.

---

[2] A different conclusion might, perhaps, be drawn from our observation 46 years ago in *Pillsbury*, 342 U. S., at 198–199, that the agency allowed claims to be filed within one year of injury but before recovery for present disability could be had. If that practice were assumed to be authorized by the Act, an injured worker who anticipated future loss of earning capacity could file a claim within the 1-year period permitted by § 13(a) yet defer litigation of the claim indefinitely until a capacity loss manifested itself, thereby undercutting our inference from the limitations provision that present disability must be conceived as including the potential for future decline in capacity. But it seems unlikely that when Congress enacted § 13(a) it intended workers to be able to file claims before they could establish all the elements entitling them to compensation. Moreover, while the practical effect of permitting protective filings and indefinitely deferring adjudication is in one respect the same as awarding nominal compensation when there is a significant possibility of future capacity loss, in that both approaches hold open the possibility of compensating a worker when the potential future economic effects of his injury actually appear, the former approach, unlike the latter, has the defect of putting off the adjudication of every element of the worker's claim, including such matters as the work-related nature of the injury, until long after the evidence grows stale. We therefore think that the inference we draw from the limitations provision is the better one.

This conclusion is confirmed by the provision of § 8(h) that in cases of disparity between actual wages and earning capacity, the natural effects of disability that will occur in the future must be given "due regard" as one of the "factors or circumstances in the case which may affect [a claimant's] capacity to earn wages in his disabled condition."  Although this mandate is phrased in general terms, its practical effect is limited to the class of cases at issue here, where the worker is presently able to earn at least as much as before his injury.  In all other cases, when injury depresses the claimant's wage-earning capacity under the conditions prevailing at the time of an award, so that the present effects of his disability are unquestionably compensable immediately, the Act already makes provision for the future effects of disability by means of § 22, which liberally permits modification of awards in response to changed conditions that occur within one year of the last payment of compensation (or a denial or termination of benefits).  33 U. S. C. § 922. *Rambo I* held that this provision allows modification whenever a changed combination of training and economic (let alone physical) circumstances reduces, restores, or improves wage-earning capacity.  515 U. S., at 296–297.[3]  Since ongoing awards may be modified if future possibilities become present realities, there is no need to account for such possibilities in calculating a worker's immediately compensable disability; the Act plainly takes a wait-and-see approach to future contingencies here.[4]  The first award in this case was

---

[3] As we noted in *Rambo I*, however, not every fluctuation in actual wages is a ground for modification, but only those shifts reflecting a change in the worker's underlying capacity, see 515 U. S., at 300–301, such as a change in physical condition, skill level, or the availability of suitable jobs.  "There may be cases raising difficult questions as to what constitutes a change in wage-earning capacity, but we need not address them here." *Ibid.*

[4] In liberally permitting modification, the Act resembles virtually all other workers' compensation schemes.  See 3 A. Larson & L. Larson, Law of Workmen's Compensation § 81.10, p. 15–1045 (1996).  "[I]t is one of the

a standard illustration of the proper practice of basing capacity determinations and compensation awards on present reality. If Rambo's initial award had already been discounted to reflect the odds of his obtaining less strenuous but higher paying work in the future, *Rambo I* could hardly have held that the Act permitted reduction of that initial award again when Rambo actually received training as a crane operator and found work using his new skills. The first award simply reflected the degree of diminished capacity operative at the time it was made, and it was proper to revise it when conditions changed.

Thus, if § 8(h)'s admonition to consider future effects when calculating capacity has any practical application, it must be because it may apply in a case such as this one, in which there is no present wage loss and would thus be no present award if compensation were to be based solely on present employment conditions. If the future were ignored and compensation altogether denied whenever present earning capacity had not (yet) declined, § 22 would bar modification in response to future changes in condition after one year.

---

main advantages of the reopening device [in workers' compensation schemes] that it permits a commission to make the best estimate of disability it can at the time of the original award, although at that moment it may be impossible to predict the extent of future disability, without having to worry about being forever bound by the first appraisal." *Id.*, § 81.31(a), at 15–1127 to 15–1132 (footnotes omitted).

The need for finality in workers' compensation awards is further reduced because compensation is paid periodically over the life of the disability, rather than in a lump sum, see §§ 14(a), (b), 33 U. S. C. §§ 914(a), (b) (providing for periodic payment of compensation). Thus, modifying a worker's compensation award generally affects future payments only, rather than retroactively adjusting a prior lump-sum payment. "Under the typical award in the form of periodic payments . . . , the objectives of [workers' compensation] legislation are best accomplished if the commission can increase, decrease, revive, or terminate payments to correspond to a claimant's changed condition," subject, under most such laws, to certain time limitations. 3 Larson, Law of Workmen's Compensation § 81.10, at 15–1045; *id.*, § 81.21, at 15–1046 to 15–1047.

To implement the mandate of § 8(h) in this class of cases, then, "disability" must be read broadly enough to cover loss of capacity not just as a product of the worker's injury and present market conditions, but as a potential product of injury and market opportunities in the future. There must, in other words, be a cognizable category of disability that is potentially substantial, but presently nominal in character.

There being, then, a need to account for potential future effects in a present determination of wage-earning capacity (and thus disability) when capacity does not immediately decline, the question is which of two basic methods to choose to do this. The first would be to make a one-time calculation of a periodic benefit following the approach of the common law of torts, which bases lump-sum awards for loss of future earnings on an estimate of "the difference . . . between the value of the plaintiff's services as they will be in view of the harm and as they would have been had there been no harm." Restatement (Second) of Torts § 924, Comment *d*, p. 525 (1977). This predictive approach ordinarily requires consideration of every possible variable that could have an impact on ability to earn, including "[e]nvironmental factors such as the condition of the labor market, the chance of advancement or of being laid off, and the like." 4 F. Harper, F. James, & O. Gray, Law of Torts § 25.8, pp. 550–551 (2d ed. 1986) (footnote omitted). Prediction of future employment may well be the most troublesome step in this wide-ranging enquiry. As the tripling of Rambo's own earnings shows, a claimant's future ability to earn wages will vary as greatly as opportunity varies, and any estimate of wage-earning potential turns in part on the probabilities over time that suitable jobs within certain ranges of pay will actually be open. In these calculations, there is room for error.[5]   Cf. *id.*, § 25.8, at 553

---

[5] As a simplified example of the sort of calculation that would be required under this approach, a factfinder might decide in the present case that Rambo has a 75% chance of keeping work as a crane operator with

(to determine lost wage-earning capacity, juries must often "use their judgment (in effect, . . . speculate)"). That juries in tort cases must routinely engage in such difficult predictions (compounded further by discounting for present value) is the price paid by the common-law approach for the finality of a one-time lump-sum judgment.

The second possible way to account for future developments would be to do in this situation just what the Act already does through the modification provision in the run of cases: to wait and see, that is, to base calculation of diminished wage-earning capacity, and thus compensation, on current realities and to permit modifications reflecting the actual effects of an employee's disability as manifested over time. This way, finality is exchanged for accuracy, both in compensating a worker for the actual economic effects of his injury, and in charging the employer and his insurer for that amount alone.

Metropolitan denies that the second, wait-and-see alternative is even open, arguing that § 8(h) gives the factfinder only two choices: either deny compensation altogether because a claimant's actual wages have not diminished, or, if the ALJ concludes that the worker's current income does not fairly represent his present wage-earning capacity, calculate the

---

annual earnings of $60,000, and a 25% chance of being laid off from that job and remaining unemployed with no income because his injuries would prevent him from performing more strenuous work, for a weighted average future wage-earning capacity of $45,000. (($60,000×.75)+($0×.25) =$45,000.) Of course, even if the factfinder somehow got the probabilities and earnings for each possible future state right, the weighted average future capacity would rarely correspond to actual developments. In our hypothetical, Rambo's actual future capacity would be $15,000 a year more than his predicted capacity if he kept his job as a crane operator, and $45,000 less if he lost that job and found no other. Thus, if a compensation award were based on the weighted average, Rambo would necessarily end up either overcompensated or undercompensated, even though the Act might meet its objectives for the system as a whole.

extent of the worker's disability (and his consequent entitle-
ment to compensation) *in toto* based on all relevant factors,
including the future effects of the disability. See Brief for
Petitioner 9. What we have already said, however, shows
the unsoundness of Metropolitan's two options.

The practical effect of denying any compensation to a dis-
abled claimant on the ground that he is presently able to
earn as much as (or more than) before his injury would run
afoul of the Act's mandate to account for the future effects
of disability in fashioning an award, since those effects would
not be reflected in the current award and the 1-year statute
of limitations for modification after denial of compensation
would foreclose responding to such effects on a wait-and-
see basis as they might arise.[6] On the other hand, trying to
honor that mandate by basing a present award on a com-
prehensive prediction of an inherently uncertain future
would, as we have seen, almost always result in present
overcompensation or undercompensation. And it would be
passing strange to credit Congress with the intent to guaran-
tee fairness to employers and employees by a wait-and-see
approach in most cases where future effects are imperfectly
foreseeable, but to find no such intent in one class of cases,
those in which wage-earning ability does not immediately
decline.[7]

---

[6] The one possible escape from this conclusion rests on an implausible
reading of the Act. A claimant could, arguably, preserve a right to com-
pensation in the future by reapplying within the 1-year period and succes-
sively each year thereafter. See § 22, 33 U. S. C. § 922 (permitting modifi-
cation "at any time prior to one year after the rejection of a claim"). But
this would be a strange way to administer the Act, for its very premise is
that a claimant would repeatedly file reapplications knowing his disability
to be without present effect and (on Metropolitan's theory) himself without
any good-faith claim to the present compensation sought.

[7] The legislative history to the 1938 amendments to the Act, which added
§ 8(h), indicates that Congress understood that the reference to future ef-
fects in the new subsection would interact with § 22 by allowing compensa-
tion for permanent partial disability for employees whose job opportuni-
ties are narrowed by injury but whose wages have not declined:

There is moreover an even more fundamental objection to Metropolitan's proposed options. They implicitly reject the very conclusion required to make sense of the combined provisions limiting claims and mandating consideration of future effects: that a disability whose substantial effects are only potential is nonetheless a present disability, albeit a presently nominal one. It is, indeed, this realization that points toward a way to employ the wait-and-see approach to provide for the future effects of disability when capacity does not immediately decline. It is simply "reasonable" and "in the interest of justice" (to use the language of § 8(h)) to reflect merely nominal current disability with a correspondingly nominal award. Ordering nominal compensation holds open the possibility of a modified award if a future conjunction of injury, training, and employment opportunity should later depress the worker's ability to earn wages below the preinjury level, turning the potential disability into an actual one. It allows full scope to the mandate to consider the future effects of disability, it promotes accuracy, it preserves administrative simplicity by obviating cumbersome enquiries relating to the entire range of possible future states of affairs,[8] and it avoids imputing to Congress the unlikely intent

---

"[Section 8(h)] provides for consideration of the effects of an injury . . . upon the employee's future ability to earn. . . . Often an employee returns to work earning for the time being the same wages as he earned prior to injury, although still in a disabled condition and with his opportunity to secure gainful employment definitely limited. . . . It is clear that in such a case the employee's ability to compete in the labor market has been definitely affected; and, though at present the employee is paid his former full-time earnings, he suffers permanent partial disability which should be compensable under the . . . Act . . . .

"In a case such as that . . . , an unscrupulous employer might with profit to himself continue the original wages . . . until the . . . right of review of the case (sec. 22) had run, . . . thus defeat[ing] the beneficent provisions of the . . . Act." H. R. Rep. No. 1945, 75th Cong., 3d Sess., 5–6 (1938); S. Rep. No. 1988, 75th Cong., 3d Sess., 1 (1938).

[8] See *Walters* v. *Metropolitan Ed. Enterprises, Inc.*, 519 U. S. 202, 208, 210–211 (1997) (weighing administrative simplicity in favor of permissible construction of statute).

to join a wait-and-see rule for most cases with a predict-the-future method when the disability results in no current decline in what the worker can earn.

Our view, as it turns out, coincides on this point with the position taken by the Director of the Office of Workers' Compensation Programs (OWCP), who is charged with the administration of the Act, and who also construes the Act as permitting nominal compensation as a mechanism for taking future effects of disability into account when present wage-earning ability remains undiminished. See Brief for Director, Office of Workers' Compensation Programs 12–21, 24–31. The Secretary of Labor has delegated the bulk of her statutory authority to administer and enforce the Act, including rulemaking power, to the Director, see *Director, Office of Workers' Compensation Programs* v. *Newport News Shipbuilding & Dry Dock Co.*, 514 U. S. 122, 125–126 (1995); *Ingalls Shipbuilding, Inc.* v. *Director, Office of Workers' Compensation Programs*, 519 U. S. 248, 262–263 (1997), and the Director's reasonable interpretation of the Act brings at least some added persuasive force to our conclusion, see, *e. g.*, *Skidmore* v. *Swift & Co.*, 323 U. S. 134, 140 (1944) (giving weight to agency's persuasive interpretation, even when agency lacks "power to control"); *Robinson* v. *Shell Oil Co.*, 519 U. S. 337, 345–346 (1997).

There is, of course, the question of how high the potential for disability need be to be recognized as nominal, but that is an issue not addressed by the parties, and it would be imprudent of us to address it now with any pretense of settling it for all time. Here it is enough to recall that in those cases where an injury immediately depresses ability to earn wages under present conditions, the payment of actual compensation holds open the option of modification under § 22 even for future changes in condition whose probability of occurrence may well be remote at the time of the original award. Consistent application of the Act's wait-and-see approach thus suggests that nominal compensation permitting

future modification should not be limited to instances where a decline in capacity can be shown to a high degree of statistical likelihood. Those courts to have dealt with the matter explicitly have required a showing that there is a significant possibility that a worker's wage-earning capacity will at some future point fall below his preinjury wages, see *Hole* v. *Miami Shipyards Corp.*, 640 F. 2d 769, 772 (CA5 1981); *Randall* v. *Comfort Control, Inc.*, 725 F. 2d 791, 800 (CADC 1984), and, in the absence of rulemaking by the agency specifying how substantial the possibility of future decline in capacity must be to justify a nominal award, we adopt this standard.[9]

---

[9] The OWCP Director argues that when the employee has the burden of persuasion, the Administrative Procedure Act's (APA's) preponderance of the evidence standard (see *infra*, at 139) requires him to show that an injury-related future decline in wages is more likely than not to occur. Brief for Director, Office of Workers' Compensation Programs 22–23. The Director's position confuses the degree of certainty needed to find a fact or element under the preponderance standard with the fact or element to be so established, which in this case is the statistical odds that wage-earning capacity will decline in the future. "The burden of showing something by a preponderance of the evidence . . . simply requires the trier of fact to believe that the existence of a fact is more probable than its nonexistence before [he] may find in favor of the party who has the burden to persuade the [judge] of the fact's existence." *Concrete Pipe & Products of Cal., Inc.* v. *Construction Laborers Pension Trust for Southern Cal.*, 508 U. S. 602, 622 (1993) (internal quotation marks omitted). In other words, the preponderance standard goes to how convincing the evidence in favor of a fact must be in comparison with the evidence against it before that fact may be found, but does not determine what facts must be proven as a substantive part of a claim or defense. See *Greenwich Collieries* v. *Director, OWCP*, 990 F. 2d 730, 736 (CA3 1993) ("A preponderance of the evidence is . . . [e]vidence which is . . . more convincing than the evidence . . . offered in opposition to it . . ." (internal quotation marks omitted)), aff'd, 512 U. S. 267 (1994). Unlike other standards of proof such as reasonable doubt or clear and convincing evidence, the preponderance standard "allows both parties to share the risk of error in roughly equal fashion," *Herman & MacLean* v. *Huddleston*, 459 U. S. 375, 390 (1983) (internal quotation marks omitted), except that "when the evidence is evenly balanced, the [party with the burden of persuasion] must lose," *Director, Of-*

We therefore hold that a worker is entitled to nominal compensation when his work-related injury has not diminished his present wage-earning capacity under current circumstances, but there is a significant potential that the injury will cause diminished capacity under future conditions.

## III

The application of this legal standard to the case before us depends in part on how the burden of persuasion is allocated. Section 7(c) of the APA, 5 U. S. C. § 556(d), which applies to adjudications under the Act, see *Director, Office of Workers' Compensation Programs* v. *Greenwich Collieries*, 512 U. S. 267, 270 (1994), places the burden of persuasion on the proponent of an order, *id.*, at 272–281; when the evidence is evenly

---

*fice of Workers' Compensation Programs* v. *Greenwich Collieries*, 512 U. S. 267, 281 (1994). Thus, under the preponderance standard, proof that a future decline in capacity is more likely than not (in the sense that the evidence predicting such a decline is more convincing than the evidence predicting none) would be required only if the fact of such a decline, rather than some degree of probability of its occurrence, were a substantive element of a claim for nominal compensation, which the Director does not maintain.

Even assuming that the Director's formally promulgated construction of the LHWCA would be entitled to deference under *Chevron U. S. A. Inc.* v. *Natural Resources Defense Council, Inc.*, 467 U. S. 837 (1984), see *Director, Office of Workers' Compensation Programs* v. *Newport News Shipbuilding & Dry Dock Co.*, 514 U. S. 122, 134 (1995), we do not defer to the Director's interpretation here of the APA's provision for allocating the burden of persuasion under the preponderance of the evidence standard, for three reasons. (1) The APA is not a statute that the Director is charged with administering. Cf. *Ardestani* v. *INS*, 502 U. S. 129, 148 (1991) (Blackmun, J., dissenting); *Chevron, supra*, at 842; *Professional Reactor Operator Soc.* v. *NRC*, 939 F. 2d 1047, 1051 (CADC 1991). (2) This interpretation does not appear to be embodied in any regulation or similar binding policy pronouncement to which such deference would apply. See *Smiley* v. *Citibank (South Dakota), N. A.*, 517 U. S. 735, 740–741 (1996); 1 K. Davis & R. Pierce, Administrative Law Treatise § 3.5, p. 120 (3d ed. 1994). (3) The interpretation is couched in a logical non sequitur, as just explained.

balanced, the proponent loses, see *id.*, at 281. On the initial claim for nominal compensation under the Act, then, the employee has the burden of showing by a preponderance of the evidence that he has been injured and that the odds are significant that his wage-earning capacity will fall below his preinjury wages at some point in the future. But when an employer seeks modification of previously awarded compensation, the employer is the proponent of the order with the burden of establishing a change in conditions justifying modification. In a case like this, where the prior award was based on a finding of economic harm resulting from an actual decline in wage-earning capacity at the time the award was entered, the employer satisfies this burden by showing that as a result of a change in capacity the employee's wages have risen to a level at or above his preinjury earnings. Once the employer makes this showing, § 8(h) gives rise to the presumption that the employee's wage-earning capacity is equal to his current, higher wage and, in the face of this presumption, the burden shifts back to the claimant to show that the likelihood of a future decline in capacity is sufficient for an award of nominal compensation. We emphasize that the probability of a future decline is a matter of proof; it is not to be assumed *pro forma* as an administrative convenience in the run of cases.

In this case, the first award of compensation was based on the parties' stipulation that Rambo suffered 22$\frac{1}{2}$% permanent partial disability as a result of his injury, whereby Rambo established that the injury impaired his ability to undertake at least some types of previously available gainful labor and thus prevented him from earning as much as he had before his accident. Metropolitan sought termination of the award based solely on evidence, which the ALJ found persuasive, that Rambo is now able to earn market wages as a crane operator significantly greater than his preinjury earnings. There is therefore substantial evidence in the record supporting the ALJ's decision to terminate actual (as

opposed to nominal) benefits, since under present conditions Rambo's capacity to earn wages is no longer depressed. But the ALJ failed to consider whether there is a significant possibility that Rambo's wage-earning capacity will decline again in the future.[10] Because there is no evidence in the record of the modification proceedings showing that Rambo's physical condition has improved to the point of full recovery, the parties' earlier stipulation of permanent partial disability at least raises the possibility that Rambo's ability to earn will decline in the event he loses his current employment as a crane operator. The ALJ's order altogether terminating benefits must therefore be vacated for failure to consider whether a future decline in Rambo's earning capacity is sufficiently likely to justify nominal compensation. Since the ALJ is the factfinder under the Act, see §§ 21(b)(3), (c), 33 U. S. C. §§ 921(b)(3), (c), however, the Court of Appeals should have remanded to the agency for further findings of fact, see, e. g., Randall v. Comfort Control, Inc., 725 F. 2d, at 799–800 (remanding for consideration of nominal award), instead of directing entry of a nominal award based on its own appraisal of the evidence. We therefore vacate the Ninth Circuit's judgment insofar as it directs entry of an

---

[10] The dissent argues that the ALJ expressly found that Rambo's present wages adequately reflect his future prospects. *Post*, at 148–150. In our view, however, the language in the modification order relied on by the dissent addresses whether Rambo's current wages accurately reflect his earning capacity under present market conditions, see *supra*, at 128 (current wages do not always reflect current capacity); *Edwards* v. *Director*, OWCP, 999 F. 2d 1374, 1375 (CA9 1993) (adopting OWCP Director's position that "earnings in post-injury employment must be sufficiently regular to establish true earning capacity"), not the distinct question whether there is a significant chance that his ability to earn will again decline in the future. See App. 53 (ALJ characterized his task as "consider[ing] wage-earning capacity in an open labor market under normal employment conditions"). The ALJ's failure to consider the latter question is not surprising, since prior to this case there was no governing authority from this Court or the Ninth Circuit approving nominal awards for possible future declines.

award of nominal compensation, and remand the case for further proceedings consistent with this opinion.

*It is so ordered.*

JUSTICE O'CONNOR, with whom JUSTICE SCALIA and JUSTICE THOMAS join, dissenting.

The Court holds today that an administrative law judge can award nominal worker's compensation benefits to an injured longshoreman whose wage-earning capacity has not dropped, and probably will never drop, below his preinjury capacity. Because I believe that § 8(h) of the Longshore and Harbor Workers' Compensation Act (LHWCA or Act), 33 U. S. C. § 908(h), requires that a worker be compensated if and only if a preponderance of the evidence demonstrates that he has a reduced wage-earning capacity—that is, a present or future loss of earning power—I respectfully dissent.

As an initial matter, I note my agreement with some of the starting points for the Court's analysis. It is common ground that "disability" under the LHWCA is an economic, rather than a medical, concept. *Ante*, at 126; *Metropolitan Stevedore Co.* v. *Rambo*, 515 U. S. 291, 297 (1995). Likewise, I agree that a worker's eligibility for compensation (*i. e.*, his disability) under the LHWCA turns on his wage-earning capacity, which depends on his ability to earn wages now and in the future. That is, I agree that an injured worker who is currently receiving high wages, but who is likely to be paid less in the future due to his injury, is disabled under the LHWCA and is therefore eligible for compensation today. See *ante*, at 128–129.

I part company with the Court first because, in my view, § 8(h) of the LHWCA, 33 U. S. C. § 908(h), requires an administrative law judge (ALJ) to make an up-front finding that "fix[es]" the worker's wage-earning capacity (and hence his eligibility for compensation) by taking into account both the worker's present and future ability to earn wages. Second,

a finding of future economic harm must be supported by a preponderance of the evidence pursuant to the Administrative Procedure Act (APA), 5 U. S. C. § 551 *et seq.*, in order to affect a claimant's wage-earning capacity. Finally, because I read the ALJ's decision as expressly finding that respondent Rambo will probably suffer no future loss of earning power, and because that finding is supported by substantial evidence, I would reverse the decision of the Court of Appeals and direct the entry of judgment for petitioner Metropolitan Stevedore Co.

I

My first point of disagreement with the Court is over how an ALJ should fix the wage-earning capacity of a worker like Rambo, whose current wages exceed his preinjury wages, but who claims that his ability to earn money may drop in the future. Section 8(h) of the LHWCA provides:

> "The wage-earning capacity of an injured employee in cases of partial disability . . . shall be determined by his actual earnings if such actual earnings fairly and reasonably represent his wage-earning capacity: *Provided, however,* That if the employee has no actual earnings or his actual earnings do not fairly and reasonably represent his wage-earning capacity, the deputy commissioner may, in the interest of justice, fix such wage-earning capacity as shall be reasonable, having due regard to the nature of his injury, the degree of physical impairment, his usual employment, and any other factors or circumstances in the case which may affect his capacity to earn wages in his disabled condition, including the effect of disability as it may naturally extend into the future."

The Court holds that § 8(h) permits an adjudicator simply to postpone any determination of whether the worker will suffer a loss in earning power so long as there is a "significant possibility" that such a loss will someday come to pass.

*Ante,* at 137. Until then, the Court rules, the ALJ can award nominal compensation, thereby propping open the agency's door for the worker to seek modification of the award in the future.

In my opinion, the LHWCA does not permit an ALJ to award purely nominal benefits in order to guard against the possibility of a future drop in earning power. Instead, the Act requires that a future reduction in a longshoreman's ability to earn money be immediately factored into a *present* determination of his wage-earning capacity. That an ALJ must make a concrete, immediate finding about a worker's wage-earning capacity is dictated by the language of § 8(h), which calls for a determination whether a worker's actual earnings "fairly and reasonably represent his wage-earning capacity." A comparison between a worker's current wages and his earning potential is possible only if the ALJ assigns a dollar amount to the claimant's wage-earning capacity. Section 8(h) further instructs that, if the worker's current pay does not correspond to his true earning capacity, the adjudicator must "fix such wage-earning capacity as shall be reasonable." Again, "fix[ing]" the worker's wage-earning capacity requires the ALJ to make a definite assessment of whether the claimant's capacity has gone up, down, or remained the same; it leaves no room for the equivocal finding that a worker's capacity *might* have changed.

The "wage-earning capacity" that an ALJ must fix is a composite concept, measured partly by the claimant's present earning ability and partly by his future earning ability. Accordingly, the ALJ's finding must reflect predictable changes in the worker's ability to earn wages. Section 8(h) lists the main factors to be taken into account: the nature of his injury, the degree of physical impairment, his usual employment, and the effect of the disability as it may naturally extend into the future. Thus, if an ALJ credits a doctor's testimony that a claimant can work for only five years before his injury leaves him bedridden, that worker would

presently have a reduced "wage-earning capacity" within the meaning of the LHWCA, regardless of whether his current wages were as high as his preinjury wages. Just because market conditions and the claimant's physical condition may vary over time does not mean that an ALJ should not consider predicted variations when fixing the worker's wage-earning capacity. Quite to the contrary, the ALJ must consider them; otherwise, he would not be "fix[ing]" the worker's capacity at all, but simply putting off that determination for another day.

Because an ALJ must make a definite finding regarding a worker's wage-earning capacity, I disagree with the Court that a worker can ever, for purposes of the LHWCA, have a "nominal current disability." *Ante*, at 135. A worker either has a reduced wage-earning capacity (however slight it may be), or he does not. To say that a claimant has a "nominal current disability," as far as I can tell, means only that he is *currently* making as much as his preinjury wages. But that answers only half the question, since the worker's *future* earning potential is also relevant to whether he has a reduced wage-earning capacity today and, hence, a compensable disability.

The Court conflates a worker's foreseeable future earning power, which must be considered when awarding benefits, with unforeseeable future developments, which justify reopening an award under § 22 of the LHWCA, 33 U. S. C. § 922. Section 22 acknowledges that a worker's wage-earning capacity can change over time, since it authorizes the Benefits Review Board to modify compensation orders in light of a "change in conditions." All that means is that when circumstances arise that were not predictable in the original benefits determination, and hence were not factored into a prior determination of a worker's wage-earning capacity, an ALJ can adjust an award. If, on the other hand, those circumstances were predicted in the original proceeding, they should have been included in the initial fixing of

the claimant's wage-earning capacity. The catch is that § 22 permits recognition of changed conditions only within one year of the denial of a claim or the last payment on an award.

The Court's mechanism for awarding nominal damages is designed solely to circumvent § 22's 1-year limit for reopening terminated or denied claims. The Court effectively recognizes as much, since it candidly admits that under its approach, "finality is exchanged for accuracy." *Ante*, at 133. That is, the 1-year limitations period established by § 22 is sacrificed in order to avoid the overcompensation and undercompensation that may result from a straightforward application of the LHWCA. *Ibid.* Congress has already evaluated these policy concerns, however, and has come down on the side of finality by enacting § 22. When a worker cannot demonstrate a reduction in his wage-earning capacity, in terms of his present or future ability to obtain gainful employment, § 22 gives that employee only one year to show that conditions have changed. To hold open a case simply because a "change in conditions" may someday arise certainly violates the spirit, if not the letter, of § 22.

The proper tradeoff between finality and accuracy is open to reasoned debate. Indeed, some state legislatures have agreed with the Court that when a worker does not immediately suffer as a result of his work-related injury, it is better to postpone compensation until his disability manifests itself. Accordingly, they have amended their workers' compensation statutes to allow precisely the sort of nominal-benefits mechanism that the Court approves today. See, *e. g.*, Cal. Lab. Code Ann. § 5802 (West 1989) ("If, in any proceeding under this division, it is proved that an injury has been suffered . . . , but it is not proved that any disability has resulted, the appeals board may, instead of dismissing the application, award a nominal disability indemnity, if it appears that disability is likely to result at a future time"). But until Congress amends the LHWCA, I do not think that the Court's approach is open to us. I would therefore hold that

an ALJ cannot circumvent § 22's 1-year limitations period by awarding nominal compensation. He must instead make a present determination of the longshoreman's wage-earning capacity, taking into account both his present and future ability to earn money.

## II

I further believe that the APA requires that a claimant's future economic injury be proved by a preponderance of the evidence before such an injury can provide a basis for awarding disability benefits under the LHWCA. This is true regardless of whether such a finding leads to an award of nominal benefits (as the Court holds) or whether such an injury should instead be factored into a claimant's wage-earning capacity immediately (as I believe). I therefore disagree with the Court's holding that merely a "significant possibility" of a future drop in a worker's wage-earning potential is relevant to a present benefits determination.

As explained in Part I, the ultimate fact to be determined in an LHWCA benefits proceeding is a worker's "wage-earning capacity," which has both a present and a future component. Thus, contrary to the Court, I think that "the fact of such a decline [in a worker's wage-earning capacity], rather than some degree of probability of its occurrence," *ante*, at 138, n. 9, must be shown in order to justify a finding of disability. The Court recognizes that the APA governs benefit determinations under the LHWCA, *ante*, at 138, so that "the proponent of a rule or order has the burden of proof," 5 U. S. C. § 556(d); see 33 U. S. C. § 919(d) ("[A]ny hearing held under [the LHWCA] shall be conducted in accordance with the provisions of" the APA). And this proof must be by a preponderance of the evidence. *Director, Office of Workers' Compensation Programs* v. *Greenwich Collieries*, 512 U. S. 267, 270–271 (1994). It follows that whether a worker has a reduced wage-earning capacity is a fact to be determined by a preponderance of the evidence.

The Court's "significant possibility" standard falls far short of the APA's preponderance of the evidence standard. Indeed, although the Court fails to define its standard with any specificity, it at least tells us that a "significant possibility" is certainly less than a "high degree of statistical likelihood." *Ante*, at 137. Thus, a longshoreman whose paycheck has not shrunk, and is unlikely ever to shrink, below preinjury levels is apparently entitled to an award of nominal damages under the Court's holding today. Such a result, it seems to me, is exactly backwards.

Not only does the "significant possibility" standard conflict with the APA, but the Court plucks it out of thin air. The Court seems to rely purely on its perception of "symmetry" in the LHWCA: Where an injury immediately depresses a worker's ability to earn wages, "the payment of actual compensation holds open the option of modification under § 22 even for future changes in condition whose probability of occurrence may well be remote at the time of the original award. Consistent application of the Act's wait-and-see approach thus suggests that nominal compensation permitting future modification should not be limited to instances where a decline in capacity can be shown to a high degree of statistical likelihood." *Ante*, at 136–137. But if symmetry is the goal, then there should logically be no threshold showing (beyond the injury itself) required to award nominal benefits under the LHWCA. Because § 22 permits modification of ongoing awards even for *completely unforeseeable changes of conditions,* "[c]onsistent application" of the Court's "wait-and-see" theory (derived from § 22) would call for keeping open *every* case to guard against the possibility that new events might someday reduce a worker's wage-earning capacity. The Court apparently realizes that such a result would completely eviscerate § 22's 1-year limitations period, and so it feels obliged to screen out at least the most attenuated claims that conditions may change in the future. As a stopgap, it invents the "significant possibility" test.

This supposed "asymmetry" in the LHWCA is not something to be circumvented, however, since it is attributable to Congress' decision to place a strict 1-year time limit on the reopening of denied or terminated claims. Under the proper interpretation of the LHWCA, a worker's wage-earning capacity is partly a function of his future ability to earn money, as proved by a preponderance of the evidence. This preponderance standard screens out claims where a worker cannot show a reduction in his future earning power. Accordingly, there is no need to engage in the sort of arbitrary line-drawing that brings us the "significant possibility" standard, in order to salvage some role for § 22's 1-year limitations period.

## III

As a final matter, I believe that the ALJ's conclusion that Rambo "no longer has a wage-earning capacity loss," App. 55, should be upheld regardless of whether the standard for fixing a worker's wage-earning capacity is the one set forth by the Court or the one described in this dissent.

I agree with the Court that Metropolitan, as the proponent of a modified compensation order, met its burden of demonstrating a "change in conditions" by proving that Rambo's actual earnings had risen significantly since he began steadily working as a crane operator. *Ante*, at 139. Upon that showing, § 8(h) shifted to Rambo the burden of proving that his new earnings did not fairly and reasonably reflect his wage-earning capacity. *Ibid.* In other words, Rambo must show that his ability to earn wages in the future is more likely than not to dip below his preinjury levels.

In his written ruling, the ALJ gave this issue his full consideration. As the ALJ observed, "higher post-injury gains/losses are not necessarily determinative of an employee's wage-earning capacity. One has to consider wage-earning capacity in an open labor market under normal employment conditions." App. 53 (citation omitted). The ALJ then specifically commented on Rambo's future job prospects: "Claim-

ant no longer has a wage-earning capacity loss. Although Claimant testified that he might lose his job at some future time, the evidence shows that Claimant would not be at any greater risk of losing his job than anyone else. Moreover, no evidence has been offered to show that Claimant's age, education, and vocational training are such that he would be at greater risk of losing his present job or in seeking new employment in the event that he should be required to do so. Likewise, the evidence does not show that Claimant's employer is a beneficent one." *Id.,* at 55. As I read this statement, the ALJ found that Rambo's current earnings adequately reflected his future job prospects—that is, he found that Rambo would not suffer any future economic loss due to his injury.

The ALJ's findings must be upheld if they are supported by substantial evidence. See 33 U. S. C. § 921(b)(3) (setting standard of review that Benefits Review Board must apply to ALJ's findings). The substantial evidence standard is extremely deferential to the factfinder: "Substantial evidence is more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Consolidated Edison Co. v. NLRB,* 305 U. S. 197, 229 (1938). Based on the evidence submitted by the parties, a "reasonable mind" could undoubtedly have found that Rambo's current earnings accurately reflected his wage-earning capacity, with regard to both his present and future job prospects. Rambo testified that he had learned to operate cranes and heavy lift trucks (tasks that he can perform despite his injury), App. 30–31; that he had worked steadily as a crane operator for one shipping line for the last 2½ years, *id.,* at 37; and that his new job paid a much higher wage than he had received before his injury, *id.,* at 38. The record clearly permitted a finding that, despite his injury, Rambo "no longer has a wage-earning capacity loss." *Id.,* at 55.

Because the ALJ properly found that Rambo's current earnings reasonably reflected his wage-earning capacity, I see no need to remand this case for further proceedings simply to demand of the ALJ a finding that he has already made. The Benefits Review Board's denial of compensation should be upheld and the Court of Appeals' decision should be reversed.