**PUBLISHED**

**UNITED STATES COURT OF APPEALS**

**FOR THE FOURTH CIRCUIT**

BETTY B COAL COMPANY,
Petitioner,

v.

DIRECTOR, OFFICE OF WORKERS'

COMPENSATION PROGRAMS, UNITED
STATES DEPARTMENT OF LABOR; ART
STANLEY,
Respondents.

No. 98-2731

BETTY B COAL COMPANY,
Petitioner,

v.

DIRECTOR, OFFICE OF WORKERS'

COMPENSATION PROGRAMS, UNITED
STATES DEPARTMENT OF LABOR; ART
STANLEY,
Respondents.

No. 99-1057

On Petitions for Review of Orders
of the Benefits Review Board.
(87-2105-BLA)

Argued: June 11, 1999

Decided: October 21, 1999

Before LUTTIG, MICHAEL, and MOTZ, Circuit Judges.

_____

No. 98-2731 affirmed and No. 99-1057 dismissed by published opinion. Judge Michael wrote the opinion, in which Judge Luttig and Judge Motz joined.

_____

**COUNSEL**

**ARGUED:** Mark Elliott Solomons, ARTER & HADDEN, L.L.P., Washington, D.C., for Petitioner. Elizabeth Hopkins, UNITED STATES DEPARTMENT OF LABOR, WASHINGTON, D.C., for Respondents. **ON BRIEF:** Laura Metcoff Klaus, ARTER & HADDEN, L.L.P., Washington, D.C., for Petitioner. Henry L. Solano, Solicitor of Labor, Allen H. Feldman, Associate Solicitor for Special Appellate and Supreme Court Litigation, UNITED STATES DEPARTMENT OF LABOR, Washington, D.C., for Respondents.

_____

**OPINION**

MICHAEL, Circuit Judge:

Betty B Coal Company filed petitions for review of two orders of the Department of Labor's Benefits Review Board (BRB), each of which resolved motions to reconsider the BRB's affirmance of an award of black lung benefits to Art Stanley, a now-deceased coal miner. We dismiss the second of the petitions for lack of jurisdiction. However, we do have jurisdiction over the first petition, and our review of that petition leads us to affirm the award of benefits. Our affirmance proceeds through several steps. First, we hold that the Department of Labor properly construed Stanley's second claim for benefits to be a request for modification made within the one-year time limit. As we will explain more fully, Stanley filed this second claim more than one year after his first claim was denied, but within one year after the denial of a first request for modification. We defer to a reasonable administrative interpretation of the governing statute to the effect that such a second claim is a timely modification request. Second, we conclude that the administrative proceedings through which Stanley was awarded benefits did not deprive Betty B of due

2

process of law. Finally, we hold that the agency properly augmented Stanley's benefits to account for his adult son, who was disabled.

I.

The procedural history of this case is both lengthy and complex. We will describe this history in some detail because it, rather than the merits of the miner's claim, is the focus of the coal company's arguments.

Twenty years ago, on May 7, 1979, Art Stanley filed a claim for benefits under the Black Lung Benefits Act (the Act), 30 U.S.C. § 901 et seq. A Department of Labor claims examiner denied the claim on July 1, 1980. The form denial letter advised Stanley that within sixty days he could submit additional evidence or request a hearing before an administrative law judge. It also informed him that he could seek "reconsideration" of the denial within a year if he could show that his condition had changed or that "a mistake was made when [his] claim was denied." (In using the term "reconsideration," the letter was referring to the Act's modification procedure, which we discuss in part III.)

Stanley submitted additional evidence on September 16, 1980, outside of the sixty-day period. On October 3, 1980, the claims examiner reiterated the denial, "administratively clos[ed]" the case, and again advised Stanley that he could seek "reconsideration," that is, modification, for up to a year after "our initial finding." Stanley did not wait long; he requested modification on October 9, 1980. Within a week, on October 16, the claims examiner contacted Stanley's lawyer by telephone and advised him that the claim would remain denied.

Eleven months later, on September 16, 1981, Stanley filed a new claim, a claim that would be construed as a request for modification of the October 16, 1980, denial. As a result of this new filing, the claims examiner, on March 9, 1982, made an initial finding of eligibility and identified Betty B as the responsible operator. Betty B filed a controversion to the claim. The case then languished for nearly five years awaiting an evidentiary hearing. A hearing was finally held before an ALJ on January 7, 1987. On July 27, 1987, the ALJ denied

3

benefits. In deciding the claim, the ALJ applied the permanent regulations at 20 C.F.R. Part 718.

Stanley appealed the ALJ's decision to the BRB. The Director of the Office of Workers' Compensation Programs filed a cross-appeal. The Director contended that the ALJ erred by analyzing the claim under the permanent regulations rather than under the interim regulations at 20 C.F.R. Part 727. On February 26, 1990, the BRB agreed with the Director and remanded the claim for reconsideration under the interim criteria. Eighteen months later, on October 29, 1991, the ALJ issued a new decision awarding benefits. Betty B appealed, and the case went before the BRB for a second time.

Stanley died of pneumonia on April 10, 1993.

On April 19, 1994, the BRB affirmed the award, but remanded for recalculation of the date of onset of disability. Just three months later, on July 29, 1994, the ALJ responded to the remand with an order setting September 1, 1981, as the date of onset. In addition, the ALJ corrected an oversight in his 1991 decision and augmented the benefits to account for Stanley's disabled adult son, Roy Dean Stanley.

Thereafter, the procedural entanglement went from bad to worse. On July 28, 1994, a day before the ALJ's order on remand, Betty B had mailed its "Motion for Leave to File Employer's Brief on Remand and Establish Briefing Schedule." Though he had already rendered a decision, the ALJ granted Betty B's motion on August 4, 1994. Perhaps unsure of how to preserve its rights, Betty B appealed the ALJ's July 29, 1994, decision to the BRB. On December 6, 1994, the ALJ issued a "memorandum" noting that Betty B had not filed the brief permitted by his August 4, 1994, order, but concluding that because of Betty B's appeal to the BRB, he no longer had jurisdiction. The Director then filed a motion with the BRB asking it to clarify the status of the case. The BRB responded by cutting the knot: it construed Betty B's motion for leave to file a brief with the ALJ as a motion to reconsider the ALJ's July 29, 1994, decision, and it dismissed Betty B's appeal as premature. Betty B then filed its brief with the ALJ.

Because of the intervening retirement of the original ALJ, the case was reassigned to a different one, who on October 7, 1996, issued an

4

order denying reconsideration. For the fourth time, the case was appealed to the BRB, and the BRB affirmed the award of benefits on October 23, 1997. Undaunted, Betty B filed a timely motion for reconsideration with the BRB. On September 30, 1998, the BRB issued an order granting Betty B's motion for reconsideration, but it rejected all of Betty B's assertions of error and reaffirmed its prior rulings in all respects. Betty B then filed a timely petition for review (No. 98-2731) of the September 30, 1998, order in this court and a second motion for reconsideration before the BRB. On December 18, 1998, the BRB summarily denied the second reconsideration request. That denial prompted Betty B to file another petition for review (No. 99-1057) in this court on January 13, 1999.

II.

Although none of the parties challenges our jurisdiction over the petitions for review, we believe that substantial questions of jurisdiction exist. As a consequence, we have a special obligation to satisfy ourselves, before deciding anything substantive, that we do have jurisdiction. Mitchell v. Maurer, 293 U.S. 237, 244 (1934).

We begin with No. 99-1057, the petition filed after the BRB summarily denied Betty B's second motion for reconsideration. Ordinarily, a petition for review of a final order of the BRB must be filed in the court of appeals within sixty days of the order. 33 U.S.C. § 921(c) (1994); 20 C.F.R. § 802.410(a). However, if a timely motion for reconsideration is filed with the BRB, the sixty-day period "will run from the issuance of the Board's decision on reconsideration." 20 C.F.R. § 802.406. The Sixth and Seventh Circuits have held that second and successive motions for reconsideration do not further toll the period for filing a petition for review. Midland Coal Co. v. Director, OWCP, 149 F.3d 558 (7th Cir. 1998); Peabody Coal Co. v. Abner, 118 F.3d 1106 (6th Cir. 1997). Hence, because No. 99-1057 was filed more than three months after the BRB's decision on the first motion for reconsideration, Midland Coal and Peabody Coal would call for its dismissal for want of jurisdiction.

We need not decide whether to follow the lead of the Sixth and Seventh Circuits today because No. 99-1057 has a more clear-cut jurisdictional defect. In that petition Betty B seeks "review of the

5

order . . . issued December 18, 1998." The specified order did nothing more than summarily deny reconsideration, and that leads to the jurisdictional problem. "[W]here a party petitions an agency for reconsideration on the ground of `material error,' i.e., on the same record that was before the agency when it rendered its original decision, `an order which merely denies rehearing . . . is not itself reviewable.'" ICC v. Brotherhood of Locomotive Eng'rs, 482 U.S. 270, 280 (1987) (quoting Microwave Communications, Inc. v. FCC, 515 F.2d 385, 387 n.7 (D.C. Cir. 1974)). Because the petition in No. 99-1057 asks us to review an unreviewable order, we must dismiss that petition for lack of jurisdiction.

The other petition, No. 98-2731, was filed November 25, 1998, within sixty days of the BRB's decision on Betty B's first motion for reconsideration. Under 20 C.F.R. § 802.406 Betty B could have then petitioned for review of the BRB's original order affirming the award, but it instead asked for review of "the decision . . . issued September 30, 1998." That decision, of course, resolved the first motion for reconsideration adversely to Betty B.

Fortunately for Betty B, however, the BRB granted that motion for reconsideration, even though it denied any relief. This action makes all the difference insofar as the reviewability of the order is concerned.

> When the [agency] reopens a proceeding for any reason and, after reconsideration, issues a new and final order setting forth the rights and obligations of the parties, that order -- even if it merely reaffirms the rights and obligations set forth in the original order -- is reviewable on its merits.

Locomotive Engineers, 482 U.S. at 278 (emphasis added). Of course, both a denial of reconsideration and a reaffirmation after reconsideration leave the situation unchanged. Moreover, an order ostensibly "denying" reconsideration may explain the agency's reasons in such detail as to demonstrate that the agency did indeed give the case a second look (and thereby "reconsidered" in a dictionary sense). How then are courts to distinguish appealable reaffirmations from unappealable denials? In Locomotive Engineers the Supreme Court drew a bright line: the agency's "formal disposition" controls.

6

> It is irrelevant that the [agency's] order refusing reconsideration discussed the merits of the [movants'] claims at length. Where the [agency's] formal disposition is to deny reconsideration, and where it makes no alteration in the underlying order, we will not undertake an inquiry into whether reconsideration "in fact" occurred. In a sense, of course, it always occurs, since one cannot intelligently rule upon a petition to reconsider without reflecting upon, among other things, whether clear error was shown. It would hardly be sensible to say that the [agency] can genuinely deny reconsideration only when it gives the matter no thought; nor to say that the character of its action (as grant or denial) depends upon whether it chooses to disclose its reasoning. Rather, it is the [agency's] formal action, rather than its discussion, that is dispositive.

Id. at 280-281. Unlike the agency in Locomotive Engineers, the BRB here formally "granted" reconsideration in its September 30, 1998, order, even though it denied any relief to Betty B. We therefore have jurisdiction in No. 98-2731.

III.

The first substantive issue in this case involves the Act's so-called "modification" procedure. Betty B argues that modification is only available for one year after the first denial of a claim, while the Director argues that each denial of modification resets the clock and starts the one-year period anew. Before going on to the particulars of this disagreement, we should describe "modification" generally.

Section 22 of the Longshore and Harbor Workers' Compensation Act (Longshore Act) provides:

> Upon his own initiative, or upon the application of any party in interest . . . on the ground of a change in conditions or because of a mistake in a determination of fact by the deputy commissioner, the deputy commissioner may, at any time prior to one year after the date of the last payment of compensation, whether or not a compensation order has been issued, or at any time prior to one year after the rejec-

7

> tion of a claim, review a compensation case . . . [and] issue a new compensation order which may terminate, continue, reinstate, increase, or decrease such compensation, or award compensation.

33 U.S.C. § 922 (1994) (emphasis added).**1** Section 22 is incorporated into the Black Lung Benefits Act by 30 U.S.C. § 932(a) (1994), and a regulation to implement it has been promulgated by the Department of Labor. 20 C.F.R. § 725.310.

This modification procedure is extraordinarily broad, especially insofar as it permits the correction of mistaken factual findings. Section 22 "vest[s] a deputy commissioner with broad . . . discretion to correct mistakes of fact, whether demonstrated by wholly new evidence, cumulative evidence, or merely further reflection on the evidence initially submitted." O'Keeffe v. Aeroject-General Shipyards, Inc., 404 U.S. 254, 256 (1971) (emphasis added); Jessee v. Director, OWCP, 5 F.3d 723, 725 (4th Cir. 1993) (concluding that the deputy commissioner may "simply rethink" a prior finding). Congress intended that this discretion be exercised whenever "desirable in order to render justice under the act." Banks v. Chicago Grain Trimmers Ass'n, 390 U.S. 459, 464 (1968). Moreover, any mistake of fact may be corrected, including the ultimate issue of benefits eligibility. Jessee, 5 F.3d at 725.

Black lung proceedings, especially at early stages, are "by nature informal." Consolidation Coal Co. v. Borda , 171 F.3d 175, 180 (4th Cir. 1999). Almost any sort of correspondence from the claimant can constitute a request for modification of a denial, as long as it is timely and expresses dissatisfaction with a purportedly erroneous denial. Id. at 181. At the other end of the formality spectrum, a claimant does not forfeit the advantages of modification just because, as in Stanley's

_____

**1** The statute's reference to a "deputy commissioner" is out-of-date. Deputy commissioners have been replaced by "district directors," 20 C.F.R. § 725.101(a)(11), and under the Administrative Procedures Act some of the duties formerly performed by deputy commissioners have been assigned to ALJs, see Jessee v. Director, OWCP, 5 F.3d 723, 725 n.2 (4th Cir. 1993); Eifler v. OWCP, 926 F.2d 663, 665-666 (7th Cir. 1991).

8

case, his filing is styled as a new claim. Banks , 390 U.S. at 465 n.8 (finding it "irrelevant" that modification request was labeled a new claim for compensation). In short, the modification procedure is flexible, potent, easily invoked, and intended to secure"justice under the act."

Betty B concedes the general liberality of the modification procedure, but it argues that the procedure nonetheless has a limit set by Congress: modification is available only for one year after the first rejection of a claim. According to the company, because Stanley's September 16, 1981, claim was filed more than one year after the initial denial on July 1, 1980, we should treat the September 16, 1981, filing as a new, "duplicate" claim, subject to the threshold "material change in condition" test at 20 C.F.R. § 725.309(d). See generally Lisa Lee Mines v. Director, OWCP, 86 F.3d 1358 (4th Cir. 1996) (en banc), cert. denied, 519 U.S. 1090 (1997). Moreover, because this new claim was filed after March 31, 1980, Betty B says that the permanent regulations at 20 C.F.R. Part 718 should apply. See 20 C.F.R. § 718.2.

The Director sees the law differently. In his view, a denial of modification is the "rejection of a claim," and a new modification petition may be filed within a year of the denial of a prior one. Thus, according to the Director, Stanley's September 16, 1981, claim constituted a timely request for modification of a claim denied on October 16, 1980, a claim that was subject to the Part 727 interim regulations. We should defer to the Director's interpretation of an ambiguous statute that he administers if his interpretation is reasonable. Pauley v. BethEnergy Mines, Inc., 501 U.S. 680, 696 (1991); Lisa Lee Mines, 86 F.3d at 1362. See generally Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837 (1984).**2** We conclude that the Director's interpretation is reasonable for several reasons.

In terms of the statutory language, the issue is whether "the rejection of a claim" includes the denial of a request for modification. In

_____

**2** The BRB agrees with the Director's position. See Garcia v. Director, OWCP, 12 BLR 1-24 (BRB 1988). In any event, it is the Director's, and not the BRB's, interpretation to which we owe deference. Potomac Elec. Power Co. v. Director, OWCP, 449 U.S. 268, 278 n.18 (1980).

9

other words, was the October 16, 1980, denial of Stanley's request for modification the rejection of a claim? The Director reasons that inasmuch as a modification request prompts a de novo review, the denial of such a request is essentially the same thing as the denial of the initial "claim." Practice under the regulations bears out this reasoning. Just as in a first claim, processing of a request for modification begins with the collection of evidence at the district director level. 20 C.F.R. § 725.310(b). If a party is dissatisfied with the district director's decision, the party may request a hearing, and the proceeding is referred to an ALJ under §§ 725.421 and .451. See Cunningham v. Island Creek Coal Co., 144 F.3d 388, 390 (6th Cir. 1998) (noting that the availability of a hearing under § 725.451 applies "to all Black Lung claims, including modification requests"); Arnold v. Peabody Coal Co., 41 F.3d 1203, 1209 (7th Cir. 1994) (holding that claimant was entitled to a hearing before an ALJ on his request for modification); cf. Lukman v. Director, OWCP, 896 F.2d 1248, 1251-1254 (10th Cir. 1990) (holding that because all "claims" are subject to hearing rules, claimant who had filed "duplicate claim" had right to hearing on whether he had shown a material change in conditions). This hearing on a modification request is de novo. Keating v. Director, OWCP, 71 F.3d 1118, 1123 (3d Cir. 1995). Moreover, the ALJ may proceed to address the issue of entitlement without first deciding the threshold modification issue -- that is, whether there was a "mistake of fact" in the prior rejection of the claim -- because a decision awarding benefits on modification would necessarily mean that the prior rejection was a mistake of ultimate fact. Kott v. Director, OWCP, 17 BLR 1-9 (BRB 1992); Motichak v. BethEnergy Mines, Inc. , 17 BLR 1-14 (BRB 1992). After the ALJ issues a decision, as this case illustrates, an aggrieved party may seek review by the BRB and the courts. Finally, it bears repeating that the factfinder is in no way bound by the findings supporting the original denial. The sum of a de novo review and a de novo process is a new adjudication. If the claimant comes out on the losing end of this new adjudication, it does no violence to the statutory language to deem the result "the rejection of a claim."

Furthermore, the limited case law on the subject also supports the Director. Our court has said, albeit in dictum, that the Director's view on this issue is correct. In Lisa Lee Mines the claimant had not filed a timely request for modification. Instead, he filed a new claim three

10

years after the denial of his initial one. <u>Lisa Lee Mines</u>, 86 F.3d at 1360. We sat en banc to decide "the proper standard to determine whether a given claimant has proved a `material change in condition'" so as to avoid 20 C.F.R. § 725.309(d)'s command that "the later claim shall be denied, on the grounds of the prior denial." <u>Id.</u> at 1362. The responsible operator, in urging us to reject the Director's proposed standard, suggested that the Director's standard was so liberal that it would invite endless, abusive litigation. We were told that claimants were sure to file over and over and over unless the "material change in condition" bar was a high one. We were unimpressed:

> This scenario belongs to that genre of horribles that seems impressive in academic debate but has little relevance to real life. Any claimant who wants to be a perpetual litigator can already be a perpetual litigator, and in a much easier fashion. The day before [a year runs from the prior denial], the miner may file a request for "modification" of the earlier denial.

<u>Id.</u> at 1364. Thus, we assumed that the modification process is available multiple times. Though not controlling here, this dictum of our en banc court at the very least attests to the reasonableness of the Director's understanding of the statute and regulations.**3**

_____

**3** In at least two cases in which multiple modification requests were made, we appear to have assumed that the intervening denials of modification were of no consequence. <u>See Curry v. Beatrice Pocahontas Coal Co.</u>, 67 F.3d 517 (4th Cir. 1995); <u>Lee v. Consolidation Coal Co.</u>, 843 F.2d 159 (4th Cir. 1988). We cannot confidently cite either as direct supporting authority, however. In <u>Lee</u>, although the claimant filed two successive modification petitions, the first one had been denied with such uncharacteristic dispatch that the second one was also filed within a year after the initial denial became final upon affirmance by the BRB. In <u>Curry</u> we described (in two footnotes) a procedural labyrinth beside which today's case resembles a crow's flight path. 67 F.3d at 519 nn.2-3. <u>Curry</u> undoubtedly involved at least two modification proceedings, but it is unclear when the initial denial became final.

A third case, <u>Borda</u>, differs from this one because the miner submitted new evidence within sixty days of the initial administrative denial, which kept the original claim alive until it was denied again a few months later. <u>Borda</u>, 171 F.3d at 178; <u>see</u> 20 C.F.R.§ 725.410(c)(2) (If claimant submits additional evidence, "the deputy commissioner shall reconsider the initial finding."). His request for modification, filed within a year of the latter denial, was therefore timely.

11

Keating, a recent decision of the Third Circuit, lends more support to the Director. There, a miner's widow had filed successive requests for modification. The one before the court was timely if the Director's interpretation of § 22 is correct, but untimely if it is not. The ALJ to whom the request was presented "chastised the widow, stating that the modification process `does not permit continuous reweighing of testimony by Judge after Judge until a friendly factfinder is found.'" Keating, 71 F.3d at 1121. The Third Circuit chastised the ALJ: "It is not apparent from the record whether she was shopping for a friendly factfinder or just a fair one. It is painfully obvious, however, that she found neither." Id. at 1120. The court reversed, holding that the ALJ had a duty to render de novo factual findings on the modification request. Id. at 1123. This holding necessarily assumes that the second modification request was timely.

Betty B attempts to rely on footnote 6 of Metropolitan Stevedore Co. v. Rambo, 521 U.S. 121 (1997), but Rambo is not helpful here. Under the Longshore Act partial disability is compensable, and the amount of compensation is measured by an injury's economic effect on the worker's present earning capacity. In Rambo the issue was how (and whether) to preserve the availability of future compensation to a longshore worker whose injury did not currently cause any loss of earnings. This situation can never happen in a black lung case because only total disability is compensable. In any event, the Supreme Court held, in agreement with the Director, that it was proper to make a nominal award that could be modified if and when the claimant suffered future economic harm. Rambo, 521 U.S. at 136-38. In footnote 6 the Court simply rejected, as a "strange way to administer the Act," the notion that the claim should be denied outright, which would put the claimant to the task of filing annual requests for modification until his economic situation changes. Id. at 134 & n.6. To the extent the Court may have implied that repeat filings might be improper, it was not on account of their repetitiveness alone, but rather because "a claimant would repeatedly file reapplications knowing his disability to be without present effect and . . . without any good-faith claim to the present compensation sought." Id. at 134 n.6.

Lastly, we address the prospect that permitting multiple petitions for modification invites abuse of the process by claimants. If there are (or should be) abuse-based limits to repetitive requests for modifica-

12

tion, this case is not the one to define them. Every court in the land is familiar with never-say-die litigants, who are frequent filers. For all their perseverence and passion, their successes are exceedingly rare. Thus, it seems quite unlikely that OWCP will often reverse course and find some "mistake of fact" after repeated denials.**4** See Jessee, 5 F.3d at 726 (noting that although an ALJ "undeniably" has the power to simply change his mind, the power would surely be exercised "seldom, if at all"). More important, Stanley's modest, informal attempts to persuade the 1980 claims examiner to change his mind could fit no objective definition of abuse.

In sum, even if this court might agree with the company that one bite at the modification apple is better policy, the Director's interpretation is not "plainly erroneous or inconsistent" with the Act or regulations. Mullins Coal Co. v. Director, OWCP, 484 U.S. 135, 159 (1987) (quoting Bowles v. Seminole Rock & Sand Co., 325 U.S. 410, 414 (1945)). Hence, we owe it substantial deference. Stanley's September 16, 1981, claim was therefore properly adjudicated as a request to modify the rejection of a claim subject to the interim regulations.

IV.

Next, Betty B asserts that it has been denied due process of law. It complains generally about the quality of the process before the BRB and the ALJs, and it asserts specifically that it had a due process right to reopen the record and to develop and present additional evidence following the BRB's 1990 holding that the interim regulations applied to the claim.

This court has not hesitated to shield operators and their insurers from liability when their core due process right to timely notice of the proceeding has been violated. See, e.g., Consolidation Coal Co. v. Borda, 171 F.3d 175 (4th Cir. 1999) (holding that failure to notify

_____

**4** It is worth noting that a change in conditions will always support de novo reconsideration, even if a year has passed since a denial, because "[t]he health of a human being is not susceptible to once-in-a-lifetime adjudication." Lisa Lee Mines, 86 F.3d at 1362. Even a tiresome repeat filer should receive his benefits if and when he becomes entitled to them.

13

operator of viable 1978 claim for benefits until 1994 deprived it of an opportunity to meaningfully defend itself); Lane Hollow Coal Co. v. Director, OWCP, 137 F.3d 799 (4th Cir. 1998) (concluding that seventeen-year delay in notifying responsible operator of claim, during which time the claimant died, deprived operator of due process); Tazco, Inc. v. Director, OWCP, 895 F.2d 949 (4th Cir. 1990) (holding that a default judgment entered without notice to the operator's insurance carrier violated the carrier's due process rights). All of these cases presented due process issues of a far different order than the one advanced today by Betty B. Betty B complains about the course of the administrative proceedings; the respondents in Borda, Lane Hollow, and Tazco were unaware that proceedings were even under way. To be sure, the course of the proceedings can violate due process, but if this happens, it will be on account of some prejudicial, fundamentally unfair element. If Betty B's "day in court" was fair (albeit imperfect) and the outcome reliable, then due process was achieved. Lane Hollow, 137 F.3d at 808.

Betty B cites Harlan Bell Coal Co. v. Lemar, 904 F.2d 1042 (6th Cir. 1990), for its specific argument that the record should have been reopened. In Harlan Bell the Sixth Circuit held that an operator had been denied due process because the ALJ had refused to reopen the record following a circuit court decision that had interpreted 20 C.F.R. § 727.203(b)(2) to mean something different than the operator thought it meant. 904 F.2d at 1048-1050. We have never endorsed Harlan Bell, and we decline to do so today. While we have no quarrel with encouraging ALJs to exercise their discretion to reopen when doing this would promote justice (and we would not hesitate to correct abuses of that discretion), we are reluctant to compel reopening as a matter of constitutional law any time debatable questions of law are resolved by the BRB or the courts. When such open questions are answered, the law has been declared, not changed.

The Part 727 regulations have been the law for over two decades, and the permanent regulations for nearly as long. Neither set of regulations is a model for draftsmen, and a great deal of litigation over their meaning has taken place. Employers have urged various employer-centered interpretations; claimants have responded in kind. Each side has won some and lost some. When employers won, some claims were vacated; when employers lost, some denials became

14

awards. That is just the way our system works. In a civil case a court does not deprive a party of due process by correcting that party's misapprehension of the law. As Justice McKenna put it many years ago:

> Due process of law does not assure to a [citizen] the interpretation of laws by the executive officers . . . as against their interpretation by the courts . . . or relief from the consequences of a misinterpretation by either. . . .[I]t is the province of the courts to interpret the laws . . . and he who acts under them must take his chance of being in accord with the final decision. And this is a hazard under every law, and from which or the consequences of which we know of no security.

Thompson v. Kentucky, 209 U.S. 340, 346 (1908).

We go from this overview to the circumstances of this case. When we look at the hearing transcript of January 7, 1987, we immediately discover that Betty B was confronted with and attempted to fend off the suggestion that the interim regulations applied to Stanley's claim and that the company was aware of the 1979 claim and of its disposition. We also discover that the applicability of the interim regulations was an issue in the very first appeal to the BRB. Although Stanley's appeal simply attacked the ALJ's factual findings, the Director noted his own appeal of the denial of benefits and urged application of 727 under Garcia.5 Finally and most importantly, we see that Betty B's professed desire to develop new evidence is of very recent vintage.

_____

5 Notwithstanding Betty B's suggestions to the contrary, the Director had standing to participate in the appeal. See 30 U.S.C. § 932(k) ("The Secretary shall be a party in any proceeding relative to a claim for benefits."). In a case that denied the Director standing under the Longshore Act as a "person adversely affected or aggrieved," the Supreme Court explicitly recognized that Congress bestowed standing on the Secretary of Labor in all black lung proceedings. Director, OWCP v. Newport News Shipbuilding and Dry Dock Co., 514 U.S. 122, 129 (1995) ("[T]he United States Code displays throughout that when an agency in its governmental capacity is meant to have standing, Congress says so.") (citing 30 U.S.C. § 932(k)).

15

At the 1987 hearing the claimant's lawyer spoke in closing argument of "triggering the presumption" and said the company had a burden to prove that cigarettes were a factor in the miner's disability. It is not absolutely certain from their context that these assertions referred to the interim presumption rather then the 15-year presumption of 20 C.F.R. 718.305, which was applicable in cases filed before January 1, 1982.**6** Betty B, however, understood the claimant to be arguing for application of the Part 727 (interim presumption) regulations. In closing argument the company's counsel argued:

> [T]he first major disagreement I apparently have with the Claimant is regarding which set of standards this claim is to be adjudicated under.
>
> [Claimant's lawyer] has made reference to the presumption and he has made reference to the interim presumption criteria. My file reflects that the application which is being adjudicated here today, was filed on September 16, 1981, which makes this a 718 claim, although there was a prior claim.
>
> That claim was denied and the case was closed out without the requisite appeals by the Claimant. I think that is the first and most important part to this case.

(Emphasis added.) Thus, unlike in Borda, Betty B cannot claim ignorance of the prior claim that has been kept alive through the modification procedure or of its opponent's argument for application of the interim criteria. Betty B's lawyer may have expected that the company would easily prevail on the issue of whether the interim criteria

_____

**6** The § 718.305 presumption differed from the Part 727 interim presumption in that it required a longer duration of coal mine employment (fifteen rather than ten years) and could be invoked only by evidence of a totally disabling respiratory or pulmonary impairment. Upon such proof the existence of pneumoconiosis and its contribution to the impairment were presumed, subject to affirmative rebuttal of either presumed fact. Consequently, if the cause of impairment was simply unknown, the presumption was not rebutted. See 20 C.F.R.§ 718.305(d); Barber v. Director, OWCP, 43 F.3d 899, 900-901 (4th Cir. 1995).

16

applied, but he surely had "notice" of it. Moreover, as we noted above, the Director pressed the issue in a cross-appeal to the BRB. In light of all of this, Betty B's suggestion that the BRB's 1990 decision (remanding for reconsideration under the interim criteria) was an unforeseeable bolt from the blue is surely an overstatement. We very much doubt that due process would be offended by failing to afford the company a second opportunity to garner and present evidence on an issue it could have and should have anticipated originally.

Regardless of whether Betty B was entitled to reopen the record and submit new evidence, the record discloses that it made no timely effort to do so. Even on the first referral of a claim to an ALJ, hearings are not automatic; a party must request a hearing in writing. 20 C.F.R. § 725.451. Once a hearing has been held, the ALJ may reopen the hearing "for good cause shown." 20 C.F.R.§ 725.454.

Betty B neither asked the ALJ for a reopening of the hearing nor suggested that reopening was compelled. On February 26, 1990, the BRB remanded the claim for reconsideration under the interim criteria. The record is then silent until the ALJ's award of benefits eighteen months later. Surely the ALJ could have by then assumed that anyone who wanted to reopen the record would have long since asked for that to be done. Betty B petitioned the BRB for review of that award of benefits. In its brief, dated May 19, 1992, it did not assert any need for further evidentiary development. Moreover, it did not suggest that it had been refused a new hearing or somehow prevented from requesting one.

When the BRB remanded yet again in April 1994, Betty B did file a motion requesting an opportunity to provide input. However, this motion was a simple and short request that Betty B be allowed to file a brief. No evidentiary hearing was requested. The ALJ granted Betty B's request to file a brief, which it filed with him after the BRB dismissed Betty B's appeal.[7] The brief to the ALJ is more of the same. Once again, Betty B made no request for a hearing of any kind and made no suggestion that further evidentiary development was neces-

_____

[7] For what it is worth, Betty B had already filed a brief in the aborted third appeal to the BRB. This brief did not raise any issue of the denial of a due process right to develop new evidence.

17

sary or even desirable. After reconsideration was denied by the ALJ and the fourth trip to the BRB was under way, Betty B submitted a brief that, at long last, asserted that a remand was required by due process for the development of new evidence under the interim standards. This brief is dated December 4, 1996, nearly seven years after the BRB ruled that the interim regulations applied. The BRB rejected the due process argument "because employer failed to raise the issue in the previous appeal, or before [the ALJ] on remand via a request to reopen the record."

We agree with the BRB. The due process right to be heard compels the government to listen, but not the defendant to speak. It is a right to "choose . . . whether to appear or default, acquiesce or contest." Mullane v. Central Hanover Bank & Trust Co., 339 U.S. 306, 314 (1950) (emphasis added). By failing to ask the ALJ to reopen the evidentiary record, Betty B acquiesced in the resolution of the claim on the existing record. The company was not deprived of due process of law.

V.

Finally, Betty B argues that the ALJ's order augmenting Stanley's benefits to account for his disabled adult son Roy Dean Stanley violated its due process rights and was improper in any event.

To begin with, Betty B likely has no defense to augmentation on the merits. The son's eligibility for and receipt of social security disability benefits is of record, and the regulations use the social security definition, see 20 C.F.R. § 725.209(a)(2)(ii), to determine eligibility for augmented black lung benefits. On the other hand, if a core violation of due process occurred, "it is no answer to say that . . . due process would have led to the same result because [the defendant] had no adequate defense upon the merits." Coe v. Armour Fertilizer Works, 237 U.S. 413, 424 (1915), cited in Lane Hollow, 137 F.3d at 808.

We turn first to the due process issue. In its opening brief Betty B asserts that it had "no opportunity to litigate Roy Dean's case at all." Petitioner's Opening Brief at 10. In its reply it contends that "when the case originally was tried, there was no need to investigate Roy

18

Dean's situation." Petitioner's Reply Brief at 11. If these assertions were accurate, they would be cause for great concern. They are <u>not</u> accurate, however.

Betty B plainly had notice that augmented benefits were sought because augmentation for Roy Dean was alleged in the modification request filed on September 16, 1981. Moreover, at the start of the hearing, the parties and the ALJ specifically identified the augmentation issue as disputed. As a result, the ALJ noted, "we will get some testimony on [the son]." Stanley testified that his son was mentally incapable of taking care of himself, received social security benefits and supplemental security income, had tried to go to school but failed, and lived at home. On cross-examination Betty B asked Stanley nothing about the matter, and it made no mention of Roy Dean in its closing argument. Finally, in its brief on remand Betty B did not request an opportunity to develop or submit evidence about Roy Dean's entitlement. Instead, it rested on an assertion that the existing record was inadequate to establish his entitlement. Thus, Betty B had notice of Roy Dean's potential eligibility and an adequate opportunity to contest it. Due process requires nothing more.

We next turn to whether, irrespective of the lack of a due process violation, the augmentation of benefits was nonetheless improper. Augmentation for Roy Dean was proper, we believe.

Betty B argues that the denial of augmented benefits became final when Stanley failed to note a cross-appeal from the ALJ's 1991 decision that awarded him benefits but neglected to mention the augmentation issue. Betty B's argument would have somewhat greater force if augmented benefits had actually and explicitly been <u>denied</u> by the ALJ or if the benefits award had been allowed to <u>become final</u> in 1991. Instead, the ALJ failed to resolve a contested issue, and he realized his error when the case was once again pending before him. We must note that even had he actually denied augmentation and had his order become final, the ALJ would have had a year during which he could have modified the order on his own initiative. <u>See</u> 20 C.F.R. § 725.310(a). The BRB cited this power in holding that "administrative efficiency" supported allowing the ALJ to correct his mistake right away rather than by invoking the modification process yet again. In short, it would require a final denial of augmented benefits and a

19

subsequent lapse of one year to make the ALJ's error irreparable. Neither occurred here.

In the alternative, the company argues that Stanley was estopped from asserting any claim for augmented benefits."An essential element of any estoppel is detrimental reliance on the adverse party's representations." Lyng v. Payne, 476 U.S. 926, 935 (1986). Moreover, the party claiming an estoppel must show that its reliance was reasonable, that is, it "did not know nor should it have known that its adversary's conduct was misleading." Heckler v. Community Health Servs., 467 U.S. 51, 59 (1984). Of course, all of Stanley's express representations concerning augmented benefits state that he was entitled to them. Moreover, because the 1991 award did not mention Roy Dean's eligibility, Stanley cannot be said to have acquiesced in a denial, let alone that the circumstances rendered his silence so pregnant with meaning as to amount to a "representation." Finally, Betty B does not explain how it reasonably relied to its detriment on any such silent "representation." The record concerning Roy Dean was made in 1987. In retrospect, Betty B may wish that it had done more to develop that record, but it cannot explain its 1987 inaction by reliance on Stanley's failure to cross-appeal in 1991. We cannot conclude that equity should impose an estoppel to bar Stanley's claim for augmented benefits.

VI.

The petition for review in No. 99-1057 is dismissed, and the award of black lung benefits to Art Stanley is affirmed in No. 98-2731.

No. 98-2731 - AFFIRMED
No. 99-1057 - DISMISSED

20