wr-84,299-01
COURT OF CRIMINAL APPEALS
AUSTIN, TEXAS
Transmitted 12/17/2015 4:47:22 PM
Accepted 12/18/2015 2:50:26 PM
ABEL ACOSTA
CLERK

**IN THE COURT OF CRIMINAL APPEALS
FOR THE STATE OF TEXAS
AUSTIN, TEXAS**

RECEIVED
COURT OF CRIMINAL APPEALS
12/18/2015
ABEL ACOSTA, CLERK

| | | |
|---|---|---|
| **EX PARTE** | § | |
| | § | |
| | § | **WR-84,299-01** |
| | § | |
| **RICHARD FREDRICK LOWREY** | § | |

**No. B-09-1028-SA-W-1**

| | | |
|---|---|---|
| **EX PARTE** | § | **IN THE 119TH DISTRICT** |
| | § | |
| | § | **COURT** |
| | § | |
| **RICHARD FREDRICK LOWREY** | § | **TOM GREEN COUNTY, TEXAS** |

## OBJECTIONS TO TRIAL COURT'S
## FINDING OF CONTROVERTED FACTS AND CONCLUSIONS OF LAW

NOW COMES applicant RICHARD FREDERICK LOWREY and files these Objections to Trial Court's "Finding of Controverted Facts and Conclusions of Law."

### I. THE TRIAL COURT'S ORDER

On November 30, 2015, the habeas court issued its "Finding of Controverted Facts and Conclusions of Law Under Code of Criminal Procedure Article 11.07" (hereinafter FFCL). The undersigned counsel did not receive notice of this order from the habeas court until December 7, 2015. The habeas court forwarded the case to the Court of Criminal Appeals on December 8, 2015.

- 1 -

## II. The Underlying Application for Habeas Corpus Relief

The habeas court's FFCL address Applicant's First Amended Application for a Writ of Habeas Corpus pursuant to Article 11.07 of the Code of Criminal Procedure. Mr. Lowrey's application is based on claims of ineffective assistance of counsel, *Brady* violations, actual innocence, and newly available scientific evidence. The habeas court recommends denial of the 11.07 application. For the reasons detailed below, Mr. Lowrey objects to the habeas court's findings and recommendations and again asks for habeas relief. For matters not specifically discussed in these objections, Mr. Lowrey rests upon the analysis in his Brief in Support of First Amended Application for a Writ of Habeas Corpus and Reply Brief in Support of First Amended Application for a Writ of Habeas Corpus.

## III. The Habeas Court Employs an Incorrect Standard of Review In Making Its Findings and Recommendations

At the heart of Mr. Lowrey's application is the interpretation of two MRIs taken of the child (Dillon) who Mr. Lowrey was found to have abused. The MRIs were never obtained at trial. Habeas counsel had to file a motion and have a hearing before the court finally ordered the State to hand over the MRIs (which had been available to the State's experts from the case's inception). Mr. Lowrey has experts who say the comparison of the MRIs indicates he is actually innocent; the State has experts who oppose that interpretation. In its review, the habeas court sides with the State's experts. It reaches its conclusions, however, by employing a

preponderance of the evidence standard of review when it instead should have employed a reasonable probability standard.[1] Its conclusions are not supportable under a reasonable probability standard.

Mr. Lowrey must demonstrate "there is a reasonable probability that . . . the result of the proceedings would have been different" if the evidence had been admitted at trial. *Strickland*, 466 U.S. at 697. "The reasonable-probability standard is not the same as, and should not be confused with, a requirement that a defendant prove by a preponderance of the evidence that but for error things would have been different." *United States v. Dominguez Benitez*, 542 U.S. 74, 82 n. 9, 124 S.Ct. 2333, 159 L.Ed.2d 157 (2004); *Strickland*, 466 U.S. at 694 ("The result of a proceeding can be rendered unreliable, and hence, the proceeding itself unfair, even if the errors of counsel cannot be shown by a preponderance of the evidence to have determined the outcome.").

Under a preponderance of the evidence standard, the side with the "superior evidentiary weight" wins. BLACK'S LAW DICTIONARY 547(2d Pocket Ed. 2001). "[T]he preponderance standard goes to how convincing the evidence in favor of a fact must be in comparison with the evidence against it before that fact may be found." *Metro. Stevedore Co. v. Rambo*, 521 U.S. 121, 137 n. 9, 117 S. Ct. 1953, 138 L. Ed. 2d 327 (1997).

---

[1] Apart from employing the incorrect standard of review, the court's analysis itself is deeply flawed, as discussed in Section IV.A below.

The habeas court opines that the State's witnesses were "more reliable" than Mr. Lowrey's witnesses. (FFCL 4). As an initial point, Mr. Lowrey was never allowed to cross-examine a single one of the State's witnesses in these proceedings. The State, on the other hand, was allowed extensive cross-examination of Mr. Lowrey's main expert (Dr. Joseph Scheller). It is unsurprising the "more reliable" witnesses are the ones whose conclusions were never challenged by cross-examination.[2] Additionally, in his Reply Brief, Mr. Lowrey challenged the doctor's conclusions by pointing out the MRIs in the study relied on by the State's witnesses looked nothing like the MRIs in this case. The habeas court ignores Mr. Lowrey's concerns about the basis of the experts' conclusions and instead blindly accepts them as accurate without first giving Mr. Lowrey the opportunity to question them.

The court then takes evidence from the State's experts and weighs it against evidence from Mr. Lowrey's experts. (FFCL 3-4). After this review, the court concludes the State's evidence is more convincing. *See Rambo*, 521 U.S. at 137 n. 9, 117 S.Ct. 1953 (explaining a preponderance standard of review is based on

---

[2] Something the habeas court found persuasive is that Mr. Lowrey's expert spends most of his time testifying on behalf of defendants. (FFCL 4). Because the State's experts went unchallenged, Mr. Lowrey was never able to present evidence he believes (based on experience from many other trials) would indicate two of the State's experts likewise spend a majority of their time testifying on behalf of the State. The court's one-sided comparison undoubtedly contains other flaws; this is an example of one that is immediately apparent. The court also indicates Mr. Lowrey's expert only evaluated the MRIs. This conclusion is inaccurate, as the evidence established the expert reviewed the entire medical files.

which side's evidence is more convincing). This is the incorrect standard of review in habeas. *See Dominguez Benitez*, 542 U.S. at 82 n.9, 124 S.Ct. 2333 (stating the proper standard of review in habeas is reasonable probability). Even though the court says "there is not a reasonable probability that the outcome would be different" (FFCL 4), it reaches its conclusion following a preponderance analysis, not a reasonably probability analysis.

Had the court employed a reasonable probability standard, there would have been some discussion as to whether the evidence from Mr. Lowrey's expert "undermines confidence" in the conviction. *See Strickland*, 466 U.S. at 694, 104 S.Ct. 2052. There is no such discussion at any point in the habeas court's FFCL.

If the court had applied the proper standard of review, its conclusions would have been in Mr. Lowrey's favor. This issue is discussed much more extensively in Section IV.A, below. The bottom line is that a pediatric neurologist (a form of expert never called at trial), testified in his professional opinion Mr. Lowrey did not cause the child's injuries. This is sufficient to shake one's confidence in the determination of guilt, which was based upon the opinion of doctors not qualified to interpret the necessary medical records. The habeas court wholly fails to discuss whether the new evidence not presented at trial undermined confidence in the verdict. The court applied the incorrect standard of review.

## IV. THE HABEAS COURT'S OTHER DETERMINATIONS ARE INSUPPORTABLE

### A. *The Habeas Court Improperly Analyzes the Medical Evidence*

As discussed above, a very important part of Mr. Lowrey's case deals with the analysis of two MRIs taken from the child, Dillon, during his medical treatment. Habeas proceedings are not the time to get into a detailed battle of the experts. A jury, not a habeas court, is the proper entity to resolve which set of experts is more believable. Nevertheless, the habeas court in its FFCL undertakes a detailed weighing of the medical evidence. Not only are the instant proceedings an improper venue for this discussion to occur, but the court's analysis itself is incorrect.

This case involved complicated medical evidence. With his undergraduate and law degrees, Mr. Lowrey's trial attorney, John Sutton, was unqualified in every sense of the word to make any medical conclusions as to the cause of Dillon's injuries. He did not even understand the terminology involved. (Sutton Testimony, at 7) ("Q. And you're not educated to understand all medical terminology, you know, much like people don't understand lawyer words? A. I would agree.").

From his opening statement to final argument, Sutton acknowledged the State's case centered on expert testimony dealing with the cause of Dillon's brain injury. It follows, then, that Sutton needed to either consult with or introduce

expert testimony. *Harrington v. Richter*, 562 U.S. 86, 106, 131 S. Ct. 770, 788, 178 L. Ed. 2d 624 (2011) ("Criminal cases will arise where the only reasonable and available defense strategy requires consultation with experts or introduction of expert evidence, whether pretrial, at trial, or both"). Instead of challenging the State's experts, Sutton accepted as true that asphyxiation was the only cause of Dillon's injuries. (3 RR 48); (2 RR 17) ("I think it's going to be uncontroverted that that is probably the result of what I will refer to as asphyxiation, meaning a lack of oxygen being supplied to the brain."). Given the central nature of the specialized expert testimony, Sutton's failure to consult or call an expert witness in this field was objectively unreasonable. *Hinton v. Alabama*, 134 S. Ct. 1081, 1090, 188 L. Ed. 2d 1 (2014) (explaining how the threat of wrongful convictions "is minimized when the defense retains a competent expert to counter the testimony of the prosecution's expert witnesses.").

The threat of wrongful convictions discussed in *Hinton* is especially chilling when put into the perspective of Mr. Lowrey's case. Neither of the experts who testified on the State's behalf at trial were qualified to testify about the causation of Dillon's brain injury. Consequently, the only experts to ever discuss the evidence at trial were not qualified to do so.

Expert testimony is admissible if the proponent satisfies a three-prong test:

1. The witness is qualified to give the opinion
2. The opinion is reliable
3. The opinion is relevant.

*Vela v. State*, 209 S.W.3d 128, 131 (Tex. Crim. App. 2006). Here, neither of the State's experts, who were simple pediatricians, was qualified to discuss the causation of Dillon's brain injuries.

Evidence obtained during the habeas proceedings establishes only a neuroscientist has the proper education, training, and experience to accurately interpret Dillon's medical records. The central issue here was whether Dillon's brain injury was caused by asphyxiation, which must be done by reading and interpreting the MRI scans of Dillon's brain. (Scheller, at 30) (describing MRI as the "definitive tool" for determining brain injury).

A medical doctor is not automatically qualified to give a medical opinion by virtue of having a medical degree. "If a medical degree carried automatic expert qualification in all medical matters, a trial judge could no longer fulfill his gatekeeping duty and 'ensur[e] that those who purport to be experts truly have expertise concerning the actual subject about which they are offering an opinion.'" *Vela v. State*, 209 S.W.3d 128, 132 (Tex. Crim. App. 2006) (quoting *Broders v. Heise*, 924 S.W.2d 148, 152 (Tex. 1996)). The *Broders* Court observed why not all doctors are competent experts in every medical field: "[G]iven the increasingly

specialized and technical nature of medicine, there is no validity, if there ever was, to the notion that every licensed medical doctor should be automatically qualified to testify as an expert on every medical question. Such a rule would ignore the modern realities of medical specialization." *Broders*, 924 S.W.2d at 152. Accordingly, "[w]hat is required is that the offering party establish that the expert has 'knowledge, skill, experience, training, or education' regarding the specific issue before the court which would qualify the expert to give an opinion on that particular subject." *Id.* at 153.

Neither of the State's pediatrician experts have received any formal education, training, or experience in any neuroscience—the particular, specific subject at issue. (2 RR 59, 92). Even when Drs. Coffman and Lukefahr provided post-habeas hearing affidavits, neither described having any neuroscientific background, instead describing their extensive training in pediatrics and child abuse, exactly like they did at trial. Dr. Lukefahr admitted he had to review "recent medical literature," on the topic to prepare his affidavit. (Lukefahr Aff., 2).

A pediatrician does not have specialized knowledge like a neurologist or a neurosurgeon—knowledge obtained by spending "four years sitting in a dark room looking at . . . radiologically generated pictures of all portions of the body." (4 RR 29). Recognizing they lacked the required specializations, both of the physician *fact* witnesses called at Applicant's trial—Drs. Patyrak and Wagnon—suggested

the proper specialist for diagnosing Dillon would be a pediatric neurologist. (2 RR 165); (4 RR 13). And as Dr. Scheller explained, the pediatricians who testified at Applicant's trial would "for sure" not have the neuroscientific qualifications necessary to read and interpret an MRI, (Scheller, 28-29) ("When you're talking about the brain, in general, it's not going to be a pediatrician or even an emergency room doctor. It's going to be a neurologist or a neurosurgeon."). Without any neuroscientific background, training, or experience, neither of the State's expert child abuse witnesses were legally "fit" to opine on the cause of Dillon's brain injuries.[3] *Vela*, 209 S.W.3d at 133.

By contrast, the doctors Mr. Lowrey has provided in the instant proceedings are highly qualified neuroscientists. Dr. Scheller is a double board certified pediatrician and pediatric neurologist with a subspecialty certification in brain and spine imaging. (Scheller, 8-10). In his twenty-five years of experience as a pediatric neurologist, he has treated thousands of patients. (Scheller, 8-10). He has testified in courts all over the country, including in Midland, Galveston, and Wichita Falls, Texas. (Scheller, 11-12). And he has helped train other pediatric

---

[3] Interestingly, even non-physicians can be qualified to testify about the causes of neurological defects, but only if they possess knowledge, skill, or training in that specific subject. *Ponder v. Texarkana Mem'l Hosp., Inc.*, 840 S.W.2d 476, 477 (Tex. App.—Houston [14th Dist.] 1991), writ denied (Apr. 22, 1992)(finding abuse of discretion in prohibiting professor with doctorate in neuroscience who taught "basic courses in neuroscience, neurology, and sensory neurophysiology to medical students[, and] advanced courses in neurophysiology, neuroanatomy, and neurochemistry to M.D.'s and Ph.D.'s," from testifying about causation of brain injury). .

neurologists at Children's Hospital in Washington D.C., a well-known training program for pediatric neurologists. (Scheller, 12). The habeas court even commented that he was a "qualified, highly trained pediatric neurologist." (FFCL, at 4)

Dr. Scheller's opinion is reliable and relevant. Drawing on his extensive training and experience, Dr. Scheller walked the habeas court through his work in Dillon's case. He showed the initial MRI from May 23, 2009, and concluded that there was no brain injury shown. (Scheller, 28). He showed the habeas court visuals of Dillon's second MRI from May 26, 2009, noting the symmetrical discoloration around the periphery of Dillon's brain. (Scheller, 36). After showing his work, including why this could *not* be a suffocation injury, (Scheller, 36), Dr. Scheller concluded sometime between May 23-26, 2009, Dillon suffered a loss of blood flow to his brain, which is most commonly caused by seizures or infection. (Scheller, 36). In other words, Dillon suffered the massive brain injury while in the care of Cook Children's Hospital. (*See* 2 RR 72).

The habeas court's findings do not make Dr. Scheller's opinion any less relevant, reliable, or admissible. The habeas court specifically found Dr. Scheller's opinions were based upon "his training and experience." This finding necessarily means Dr. Scheller drew upon what he learned during medical school, while obtaining his specialty certifications, and what he observed in his twenty-five year

medical career doing what neurologists do: reading and interpreting the MRIs of thousands of patients. At that point, Dr. Scheller satisfied the preliminary requirements to testify as an expert. *Davis v. State*, 313 S.W.3d 317, 350 (Tex. Crim. App. 2010) (noting "expertise can be acquired in numerous ways, including by training or experience"). Therefore, the habeas court's conclusion that "there is a question if [Dr. Scheller] would be permitted to testify as an expert" at trial is erroneous. (FFCL, 4).[4]

The habeas court went on, however, to claim Dr. Scheller's opinion was unreliable precisely *because* it was based on his training and experience. But every reason given for the habeas court's conclusion goes to the weight of Dr. Scheller's testimony, not its admissibility. For example, a repeated theme throughout the FFCL is that Dr. Scheller did not cite studies while the State's experts did. This finding ignores that Dr. Scheller was never asked, by either party, to cite any studies in support of his opinions. Rather, Dr. Scheller cited real-life instances where children, who had never had a seizure disorder before, presented at the emergency room with seizures that were "out of control." (Scheller, 38).

As another example, the habeas court faulted Dr. Scheller for overlooking other evidence of trauma, including bruising. (Findings, 3). This finding ignores

---

[4] The habeas court reached its conclusion without performing the necessary reliability analysis. *Kelly v. State*, 824 S.W.2d 568, 573 (Tex. Crim. App. 1992). Had the court performed the proper analysis, it would be forced to conclude that all but one of the seven *Kelly* reliability factors weigh in favor of reliability. *See id*.

the very first doctor who treated Dillon when he presented at the emergency room performed a full examination of Dillon and did not see any significant signs of abuse or any bruising. (2 RR 168).

As another example, the trial court disbelieved Dr. Scheller's testimony because he "attributed the unexplained, prior incidents to seizure because 'children have seizures.'" (Findings, 3). But, in fact, what Dr. Scheller said was: "Seizures are uncommon. Only two or three percent of children have seizures. And so, we're talking about something uncommon to begin with." (Scheller, 56).

As a final example, the trial court discounted Dr. Scheller's opinion because it relied on "a history of seizures reported only by Mr. Lowrey." (FFCL, 4). The habeas court's determination forgets that experts are permitted to rely on such information provided by witnesses. But the finding also ignores a much larger coincidence. At the habeas hearing, Dr. Scheller explained how child seizures manifest themselves in a similar way to how Rick described one of the "prior incidents" at trial. *Compare* (Scheller, 31) ("Those seizures might simply make a child look lethargic, might simply make a child look unresponsive, weak, **out of it**. A seizure in a child doesn't necessarily look like a seizure that we're familiar with adults when they bite their tongue, they're shaking all over and they turn purple. Seizures in children can be much more subtle."), *with* (3 RR 24) ("and I could hear Dillon crying, so I went into his room. And it didn't seem like it was a normal cry.

**He just was a little out of it**.") (emphasis added). It is unfathomable that Applicant could foresee himself getting convicted, and later at his habeas hearing, a doctor whom he had never met before from Baltimore, would testify that children have subtle seizures and appear "out of it."

Going further, Dr. Scheller's description loosely comports with Deborah's description of Dillon's "prior incidents." (2 RR 141) (describing Dillon as "disoriented").[5] "Even if some facts were not taken into account by the expert is a matter of weight and credibility, not admissibility." *Jordan v. State,* 928 S.W.2d 550, 556 (Tex. Crim. App. 1996).[6]

---

[5] The State repeatedly tries to suggest that because Mr. Lowrey was present when Dillon's prior incidents occurred, he must be responsible. This particular incident completely undermines that determination because Dillon's mother explains that Rick was in bed when she went to take a shower, and Rick was still in their bedroom, not Dillon's, when she got out of the shower to check on Dillon. (2 RR 141). In other words, the hobbyhorse incident could not have been an intentional attempt by Rick to injure Dillon.

[6] The habeas court also suggested Dr. Scheller's opinion was inadmissible because he did not agree with blanket diagnoses of shaken baby syndrome accepted by the American Academy of Pediatrics. (Findings, 4). This is not a shaken baby case and, therefore, irrelevant. But Applicant would point the Court to the significant, current legal and scientific discourse on the topic. Deborah Tuerkheimer, *The Next Innocence Project: Shaken Baby Syndrome and the Criminal Courts,* 87 WASH. U. L. REV. 1 (2009),
*available at* http://openscholarship.wustl.edu/law_lawreview/vol87/iss1/1;
David A. Moran, *Shaken Baby Syndrome, Abusive Head Trauma, and Actual Innocence: Getting it Right,* HOUS. J. HEALTH L. & POL'Y 12, no. 2 (2012): 209-312,
*available at* http://repository.law.umich.edu/cgi/viewcontent.cgi?article=1559&context=articles.
Dr. Scheller was simply doing what scientists do: having a scholarly disagreement. If at all relevant, this goes to the weight of Dr. Scheller's opinion, not the admissibility. *See Jordan, supra.* And, as discussed in Section III, the weight of the evidence (which comes into play with a preponderance of the evidence standard of review) is of little relevance in habeas (where the standard of review is reasonable probability to undermine confidence in the outcome).

Likewise, the habeas court apparently credited Dr. Rotenberg's qualifications and opinion.[7] Indeed, the habeas court used Dr. Rotenberg's affidavit in an attempt to further discredit Dr. Scheller. (FFCL, 4). The habeas court again confuses the issues, overlooking that Dr. Rotenberg's affidavit, on its own, was enough to show prejudice from Sutton's failure to consult or call a neuroscientist on behalf of Mr. Lowrey.

Like Dr. Scheller, Dr. Rotenberg was highly qualified. He is a double board certified pediatrician and pediatric neurologist. (Rotenberg Aff., 1). He has subspecialty certifications in epilepsy and sleep medicine. (Rotenberg Aff., 1). He served as the chief of a pediatric hospital for two years. He also served as an assistant clinical professor at three different universities. Importantly, a "significant component of his training" involved interpreting brain imaging including CT and MRI scans. He has viewed "thousands" of these images. He has also treated many children who have suffered hypoxic ischemic encephalopathy.

After reviewing Dillon's medical records and MRIs, Dr. Rotenberg concluded he was "uncertain" Dillon's injury was intentionally inflicted. Further, Dr. Rotenberg could not rule out other accidental causes, concluding he was "hesitant" to attribute Dillon's injuries to being intentionally inflicted.

---

[7] To the extent the trial court did not explicitly comment on Dr. Rotenberg's credibility, Applicant objects.

As in *Ex parte Briggs*, and *Ex parte Henderson*, an expert's testimony that the cause of a child's injuries are "undetermined," raises at least a probability sufficient to undermine the outcome that the child's injury was the result of a criminal act. *Ex parte Briggs*, 187 S.W.3d 458, 460, 470 (Tex. Crim. App. 2005) (finding ineffective assistance based on undetermined cause of child's injuries); *Ex parte Henderson*, 384 S.W.3d 833, 844 (Tex. Crim. App. 2012) (Cochran, J., concurring) (finding actual innocence based on undetermined cause of injuries). This case is no different.

As acknowledged in *Henderson*, experts disagree. At bottom, they are scientists. If scientists all agreed, the prevailing school of thought may still be that the earth is flat. As scientists do, Dr. Scheller and Dr. Rotenberg disagreed with the State's pediatrician experts. The question, though, is not whether the habeas court believes the experts. It's whether based on two highly qualified experts' opinions that the cause of Dillon's brain injury was either natural or unknown, confidence in the verdict has been undermined. Given that the verdict was based on unobjected to, unqualified "expert" testimony to the contrary, Applicant's conviction cannot stand.

### B. The Habeas Court's Conclusions Regarding Counsel's Deficient Performance are Insupportable

Apart from improperly evaluating the medical evidence and the experts' opinions, the habeas court also improperly evaluates the performance of Sutton

himself. Mr. Lowrey's first ground of error is that his Sutton's failure to investigate was deficient, and the resulting harm caused by that failure violated his Sixth Amendment rights. *See Strickland v. Washington*, 466 U.S. 668, 689, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). The facts uncovered in the habeas proceedings were uncontroverted: (i) apart from a brief phone call with one of the State's experts, Sutton failed to consult with an expert in an attempt to develop the defense; and (ii) counsel failed to seek out a single witness in mitigation of punishment, even though many such witnesses were ready, willing, and able to testify

An attorney's performance is deficient when it falls "below an objective standard of reasonableness" under prevailing professional norms and according to the necessity of the case. *Ex parte Moore*, 395 S.W.3d 152, 156–57 (Tex. Crim. App. 2013). The reviewing court refers to standards published by the American Bar Association and other similar sources as guides to determine prevailing professional norms. *Id.* (citing *Strickland*, 466 U.S. at 688–89, 104 S.Ct. 2052; citing ABA Standards for Criminal Justice (2d ed.1980)).

Both the ABA Standards and the Texas Guidelines for Criminal Defense mandate an attorney has the duty to "explore all avenues leading to facts relevant to the merits of the case." ABA Standards for Criminal Justice: Prosecution and Defense Function 4.1(a) (3d 1993)); Standing Committee on Legal Services to the

Poor in Criminal Matters, *Performance Guidelines for Non-Capital Criminal Defense Representation,* 74 TEX. BAR. J. 624 (July 2011). Caselaw likewise establishes trial attorneys must fully investigate the case, and limitations on counsel's investigation are appropriate only if they are reasonable. *Wiggins v. Smith*, 539 U.S. 510, 521, 123 S.Ct. 2535, 156 L.Ed.2d 471 (2003); *Ex parte Briggs*, 187 S.W.3d 458, 467 (Tex. Crim. App. 2005).

### 1. Trial Counsel Was Deficient in Failing to Consult with an Expert

Trial counsel failed to consult with an expert in understanding complicated medical issues. His failings were unreasonable. The habeas court acknowledges Mr. Lowrey's claims are centered on the interpretation of the two MRIs. The court also implicitly acknowledges that even pediatric neurologists with decades of training and experience cannot agree on what the MRIs show.

And yet, the habeas court is satisfied with trial counsel's absolute reliance on his own research in developing a defense—research done without the benefit of the necessary medical records. Despite the differences in their ultimate conclusions, every expert in this case indicated he could not form any opinion without first viewing Dillon's entire medical records, including the two MRIs. In his understandable ignorance, counsel never asked for either. Yet his internet research done without the medical records, according to the habeas court, was sufficient.

The court equates trial counsel's internet search (done without the necessary records) with experts' medical degrees and years of training and experience. This reasoning is insupportable. Lawyers are not neurologists; they are not neurosurgeons. Trial counsel's "research" was useless. The instant proceedings (where experts were finally consulted) prove there *is* a debatable issue that trial counsel would have discovered had he consulted a medical expert. That debate should have occurred at trial before Mr. Lowrey was sent to prison for the next thirty-five years.[8] Counsel's failure to consult with an expert in an area only an expert can interpret falls below the norms of the profession. *See* ABA Standards for Criminal Justice 4.1(a); *Performance Guidelines for Non-Capital Criminal Defense Representation,* 74 TEX. BAR. J. 624.

## 2. Trial Counsel Was Deficient in Failing to Consult a Single Person in Mitigation of Punishment

It is undisputed that counsel never contacted a single witness for mitigation of punishment. Trial counsel must "conduct a prompt investigation of the circumstances of the case and to explore all avenues likely to lead to facts relevant to the merits of the case." *Ex parte Briggs*, 187 S.W.3d 458, 467 (Tex. Crim. App. 2005) (internal citation omitted). This is an "absolute duty." *Id.* The habeas court never issues any findings regarding the deficiency of counsel's failure to call any

---

[8] It also should have been discussed with Mr. Lowrey before he was advised to waive a jury and try the case before the trial court.

- 19 -

witnesses in mitigation of punishment. (FFCL 6). Undoubtedly, counsel's wholesale failure to call a single witness was unreasonable. *See Lair v. State*, 265 S.W.3d 580, 594 (Tex. App.—Houston [1st Dist.] 2008, pet. ref'd) (stating an attorney is deficient if he fails to conduct a thorough investigation); *Milburn v. State*, 15 S.W.3d 267, 270 (Tex. App.—Houston [14th Dist.] 2000) (finding an attorney who did not question any possible mitigation witnesses was deficient under *Strickland* because "counsel can only make a reasonable decision to forego presentation of mitigating evidence after evaluating available testimony and determining that it would not be helpful").

### B. Trial Counsel's Deficient Performance Prejudiced Mr. Lowrey

Because the trial attorney failed to conduct any investigations, he was never able to present the Court with evidence key to Mr. Lowrey's defense and to the punishment determination. As discussed in Section III and Section IV.A, above, there is a reasonable probability that, had counsel presented an expert witness, the outcome would have been different. There is also a reasonable probability that, had counsel presented a single witness in mitigation of punishment, the sentence would have been lower.

The habeas court concludes the presentation of mitigation witnesses would not have changed the outcome in the case. This conclusion disregards the

importance of mitigation witnesses, a vital role widely recognized in caselaw. For example, in *Millburn*,

> appellant's trial counsel performed no investigation into any possible mitigating factors and failed to contact even a single family member or friend, despite the availability of such mitigation evidence . . . These witnesses would have testified that, *inter alia*, appellant was a good father to a child of special needs and that he was an outstanding employee. This evidence would have provided some counterweight to evidence of bad character which was in fact received by the jury.

*Id.* at 270-71. A similar situation occurred in *Shanklin v. State*, 190 S.W.3d 154 (Tex. App.—Houston [1st Dist.] 2005, pet. dsms'd). In that case, the only mitigation evidence the defense put on was the defendant himself. *Id.* at 165. Counsel admitted he did not investigate any mitigating factors and did not contact a single family member or friend, despite knowing such witnesses were available. *Id.* "These witnesses would have testified that appellant took great care of his son, helped his friends and relatives, and worked hard." *Id.* The court noted, "[t]his evidence would have shown the jury that [the defendant] also had good character traits." *Id.*

Even though the court in *Shanklin* could not "say for certain" that the witnesses would have influenced the jury's punishment, it could not escape the fact that the jury "would have considered it and possibly have been influenced by it." *Id.* at 166. In this case, there were multiple witnesses who would have testified to Mr. Lowrey's many outstanding character traits, some of which were relevant in

both the guilt-innocence and punishment phases of trial. It is unreasonable to conclude such testimony from so many witnesses would have had no possible influence on the sentence.[9]

## V. PRAYER

FOR THE REASONS ABOVE, and for the reasons in all of the pleadings filed by Applicant in the trial court, Applicant Richard Frederick Lowrey respectfully requests the Court reject the habeas court's Findings of Fact and Conclusions of Law and grant Mr. Lowrey the new trial he deserves.

---

[9] In its prejudice analysis of Mr. Lowrey's claim of ineffective assistance of counsel for failure to call mitigation witnesses, the court concludes "[the] witness testimony, if presented at trial, would not have changed the outcome." (FFCL 6). This again, is not the proper standard of review for the court to employ. The question is not whether the outcome would have changed. The question is much closer to whether the outcome may have been impacted by the evidence, i.e. whether one's confidence in the outcome is undermined. *See Strickland*, 466 U.S. at 694, 104 S.Ct. 2052.

Respectfully submitted,

**Hurley, Guinn & Sellers**

By: /s/ Frank Sellers
Frank Sellers
State Bar No. 24080305
Frank@hurleyguinn.com

Daniel W. Hurley
State Bar No. 10310200
dwh@hurleyguinn.com

1805 13th Street
Lubbock, Texas 79401
P: (806) 771-0700
F: (806) 763-8199

**Law office of Allison Clayton**

By: /s/ Allison Clayton
Allison Clayton
State Bar No. 24059587
Allison@AllisonClaytonLaw.com

P.O. Box 64752
Lubbock, Texas 79464-4752
P: (806) 773-6889
F: (806) 688-4515

## Certificate of Service

I certify that on December 17, 2015, a copy of the foregoing was served upon the Tom Green County District Attorney by email to Allison.Palmer@co.tom-green.tx.us.

/s/ Frank Sellers
Frank Sellers